TIMBER TRAILS CORPORATION *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF SHERMAN

STEPHEN EISNER ET AL. *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF SHERMAN ET AL.
(13970)

PETERS, C. J., SHEA, GLASS, COVELLO and BORDEN, Js.

Argued February 19—decision released June 3, 1992

*George C. Hastings,* with whom was *Linda L. Morkan,* for Timber Trails Corporation, the appellant (plaintiff in the first case and defendant in the second case).

*Creighton M. English,* for the appellee planning and zoning commission (defendant in both cases).

*Frank J. Silvestri, Jr.,* with whom was *David P. Friedman,* for the appellee (plaintiff in the second case, Timber Trails Property Owners Association, Inc.).

SHEA, J. These appeals were consolidated for trial as well as appeal, and separate judgments in each case were rendered by the trial court on the same date, December 18, 1989, ten days after its rendition of judgment in the companion case of *Timber Trails Corporation* v. *Planning & Zoning Commission,* 222 Conn. 374, 610 A.2d 617 (1992) (*Timber Trails I*). In that case this court has on this date rendered judgment invalidating an amendment to the zoning regulations of the town of Sherman adopted on October 2, 1978, increasing the minimum lot size requirement in zone B from 40,000 square feet to 80,000 square feet and making land in zone B subject to the requirements of zone A, for failure to comply with the requirement of General Statutes § 8-3 that a copy of the proposed amendment must be filed in the office of the town clerk "for public inspection at least ten days before" the public hearing.

Both cases arise out of the action of the defendant Sherman planning and zoning commission on February 21, 1980, approving the application of Timber Trails Corporation, the plaintiff in the first case, and a defendant in the second case, for a twenty-two lot subdivision of its land with modifications that reduced the number of lots to sixteen and also imposed several conditions. In the first case, the corporation, claiming that its application should have been granted without modification, appealed from that decision to the Superior Court, which dismissed the appeal. In the second case, five persons[1] owning property abutting or in the vicinity of the proposed subdivision also appealed from the decision of the commission approving the subdivision, and

[1] The original plaintiffs were Stephen Eisner, Marie Ray, Margery Porter, Carlo Henze and Edwin Barber, each of whom owned property in the Timber Trails development at the time of their appeal, March 11, 1980. By the time these cases were argued in this court on February 19, 1992, only Edwin Barber still owned property within the development. He had withdrawn as a named plaintiff, but remained a member of the Timber Trails Property Association.

an additional plaintiff, The Timber Trails Property Owners Association, was later admitted on motion. The trial court held that the commission had illegally approved the sixteen lot subdivision because the lots contained less than 80,000 square feet of area in violation of the zoning amendment that this court has nullified in *Timber Trails I,* and accordingly rendered judgment sustaining the appeal of the property owners and their association, effectively invalidating the commission's action in approving a sixteen lot subdivision subject to specified conditions.

After obtaining certification, the corporation appealed from both judgments to the Appellate Court, and we transferred the appeals to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). The corporation has raised eight issues in support of its claim that the judgments in each case should be reversed, but our decision in *Timber Trails I,* invalidating the amendment increasing the minimum lot size in the applicable zone for the subdivision to 80,000 square feet, has mooted some of them and others are now also moot.[2] The remaining issues are: (1) in

---

[2] Three of the mooted issues relate to the application of General Statutes §§ 8-28a and 8-28b, which contain so-called "grandfather" provisions that the corporation claims would insulate its subdivision plan from the application of the increased lot area requirement imposed by the October 2, 1978 amendment to the zoning regulations that this court invalidated in *Timber Trails I.* Another moot issue involves a proposed settlement agreement from which the association withdrew its consent during the course of the proceedings for approval of the agreement by the trial court pursuant to General Statutes (Rev. to 1979) § 8-8 and which can no longer be resurrected in view of the absence of such consent. The remaining issue that we find unnecessary to discuss is whether the state trial referee, because of his involvement during the proceeding for approval of a settlement of the appeals pursuant to § 8-8, was disqualified from filing the memorandum of decision disposing of the cases on their merits, which he had prepared long before the occasion for the claim of disqualification arose, but had delayed filing to allow time for the parties to reach a settlement, pursuant to their request. There is no basis for any claim that the alleged disqualification of the trial referee arising during the settlement proceeding had any influence on the judgments rendered.

the first case, whether the modifications and conditions imposed by the commission on its approval of the subdivision plan were equivalent to a failure of the commission to act on the corporation's application within the time allowed by General Statutes § 8-26d; (2) in the second case, whether the association, which owns no property in the area, may prosecute a zoning appeal by virtue of the aggrievement of one or more of its members; and (3) in both cases whether the commission abused its discretion in modifying the application and in approving it for sixteen lots, subject to the conditions imposed. We conclude that the commission's approval of the application subject to modifications and conditions fulfilled the statutory requirement for action on the application within the time prescribed, that the association had the requisite standing and that the commission did not abuse its discretion. Accordingly, we affirm the judgment dismissing the corporation's appeal in the first case and reverse the judgment sustaining the appeal of the association and the individual plaintiffs in the second case.

I

In the first case, the corporation claims that its application for a twenty-two lot subdivision filed on August 2, 1979, was automatically approved, pursuant to General Statutes (Rev. to 1979) § 8-26,[3] when the

---

[3] General Statutes (Rev. to 1979) § 8-26 provided in part: "All plans for subdivisions and resubdivisions, including subdivisions and resubdivisions in existence but which were not submitted to the commission for required approval, whether or not shown on an existing map or plan or whether or not conveyances have been made of any of the property included in such subdivisions or resubdivisions, shall be submitted to the commission with an application in the form to be prescribed by it. . . . The commission may hold a public hearing regarding any subdivision proposal if, in its judgment, the specific circumstances require such action. No plan of resubdivision shall be acted upon by the commission without a public hearing. Notice of the public hearing shall be given by publication in a newspaper of general circulation in the municipality at least twice at intervals of not less than two

commission did not take *valid* action on that application within sixty-five days after the public hearing on it. Specifically, the corporation maintains that, although the commission was authorized by § 8-26 to "modify and approve" its application, the commission's conversion of the twenty-two lot plan into a sixteen lot plan changed the subdivision application so fundamentally that it cannot be considered a mere "modification" of it. Relying on this court's decision in *Carpenter* v. *Planning & Zoning Commission*, 176 Conn. 581, 409 A.2d 1029 (1979), the corporation further claims that the commission acted outside its statutorily granted author-

days, the first not more than fifteen days, nor less than ten days, and the last not less than two days prior to the date of such hearing, and by sending a copy thereof by registered or certified mail to the applicant. *The commission shall approve, modify and approve, or disapprove any subdivision or resubdivision application or maps and plans submitted therewith, including existing subdivisions or resubdivisions made in violation of this section, within the period of time permitted under section 8-26d.* Notice of the decision of the commission shall be published in a newspaper having a substantial circulation in the municipality and addressed by certified mail to any person applying to the commission under this section, by its secretary or clerk, under his signature in any written, printed, typewritten or stamped form, within fifteen days after such decision has been rendered. Such notice shall be a simple statement that such application was approved, modified and approved or disapproved, together with the date of such action. *The failure of the commission to act thereon shall be considered as an approval, and a certificate to that effect shall be issued by the commission on demand.* The grounds for its action shall be stated in the records of the commission." (Emphasis added.)

General Statutes (Rev. to 1979) § 8-26d provided in relevant part: "In all matters wherein a formal application, request or appeal is submitted to a planning commission under this chapter and a hearing is held on such application, request or appeal, such hearing shall commence within sixty-five days after receipt of such application, request or appeal and shall be completed within thirty days after such hearing commences. *All decisions on such matters shall be rendered within sixty-five days after completion of such hearing.* The applicant may consent to one or more extensions of any period specified in this subsection, provided the total extension of any such period shall not be for longer than the original period specified in this subsection, or may withdraw such application, request or appeal." (Emphasis added.)

ity when it conditioned approval of the subdivision application on the corporation's ability to obtain approval of its water system by the Connecticut department of business regulation, division of public utility control (DPUC).[4] We are not persuaded that the commission acted illegally either by altering the corporation's plan or by placing this condition on its approval. Consequently, we reject the argument that the twenty-two lot application was automatically approved because the commission failed to take proper action within sixty-five days of the hearing.

Some background information is necessary for the proper analysis of this claim. On August 2, 1979, the corporation filed with the commission an application for a twenty-two lot subdivision to be located in an area in Sherman known as the Valley Lake section. A public hearing on the application was held on September 28, 1979. On November 6, 1979, the corporation consented to a sixty-five day extension of time and, on January 4, 1980, agreed to another sixty-five day extension. At a special meeting on February 21, 1980, the commission voted to approve the application with "[m]odifications and contingent approval until [the DPUC] approves water system and its bonding and the Commission is assured there will be no downgrading of water service to the present residents." The modifications included withholding approval of two lots and combining several other lots or portions thereof, and resulted in the approval of a sixteen lot subdivision.[5]

---

[4] The agency has since been renamed the department of public utility control. See Public Acts 1980, No. 80-482.

[5] The commission voted to approve the corporation's application with the following modifications:

"(1) Lot #1 not be approved at this time but continue as a maintenance and equipment storage area until such time as a new area is approved by the Commission and all necessary facilities completed. At such time lot status will be reconsidered.

"(2) Combine lots #2 and #3.

## A

In its appeal to the trial court, the corporation raised the claim that the twenty-two lot application was automatically approved because the commission's action on the application was legally improper and thus was no "action" at all within the meaning of § 8-26. The trial court rejected the claim because it had concluded that the amendment to the zoning regulations increasing the minimum lot size to 80,000 square feet, which we have since invalidated in *Timber Trails I,* was valid and applicable to the corporation's application. Since many of the lots included in the application were less than 80,000 square feet in size, the court reasoned that the commission was powerless to approve it according to § 8-26, which provided that "nothing in this section shall be deemed to authorize the commission to approve any such subdivision or resubdivision which conflicts with applicable zoning regulations."

Section 8-26 authorizes a planning and zoning commission to "modify and approve" a subdivision application, but does not define the scope of the term "modify." It is well established, however, that "[i]n exercising its function of approving or disapproving a subdivision plan, the planning board acts in an administrative capacity. In passing upon a plan, its action is controlled by the regulations adopted for its guidance."

"(3) Combine lot #4 with the northern two-thirds portion of lot #5.

"(4) Combine south one-third of lot #5 with lot #6 and join the new north line of #6 with south line #17.

"(5) Combine #7 and #16; provide 20 foot access on the north side of the ski slope to the combined lots #7 and #16 from Big Trail.

"(6) Discontinue dead-end spur road entirely, just continue loop at lots #4 and #18, provide two 20 foot access ways for lots #6 and #17. This alone will save the developer thousands of dollars in road costs.

"(7) Withhold approval of lot #18 until such further testing is done to satisfy the Town Sanitarian that a septic system can be installed with safety.

"(8) Combine Lots #9 and #10."

*Langbein* v. *Planning Board,* 145 Conn. 674, 679, 146 A.2d 412 (1958). If the regulations in effect at the time authorized the commission to approve a plan with fewer lots, then the commission must be deemed to have exercised properly its authority to "modify and approve" the application within the meaning of § 8-26, and the corporation's claim must fail.

In considering the corporation's application, the commission expressed concern that, because the property contained much rugged terrain, "many of these lots have severe or very severe conditions which limit installation of septic systems." The property's proximity to Valley Lake also troubled commission members because "[a]ny failure of a system in the proposed subdivision would endanger the purity of the lake and thus jeopardize its use as an active recreational area." The commission further noted that any contamination of Valley Lake would endanger the purity of the drinking water supply in New York City because Valley Lake, as part of the Hudson River Basin, flows into the New York City water system. Commission members also feared a threat to the purity of the water supply of future subdivision residents since the corporation's application proposed locating wells immediately adjacent to Valley Lake. Questions arose at the final meeting on the application about whether the water system for the proposed subdivision would "tap from the present system in serving the new subdivision, thus downgrading the older system," and about how best to "safeguard the present property owners' water supply."

At the time the corporation's application was being considered, § 3 (f) of the Sherman subdivision regulations provided: "The Commission is empowered to require that lots larger than required by applicable zoning regulations be plotted where deemed necessary because of inadequate drainage or sewage disposal con-

ditions." This regulation[6] expressly granted authority to the commission to require larger lots in the subdivision than had been proposed by the corporation under circumstances such as these, where the commission had serious concerns about the purity and adequacy of the water system. The corporation does not claim that the regulations were not duly adopted or that they exceeded the scope of authority granted by the enabling legislation. See *Finn* v. *Planning & Zoning Commission,* 156 Conn. 540, 244 A.2d 391 (1968). It does not argue that there was insufficient evidence to support the commission's expressed concerns about the water system. See *Gardiner* v. *Conservation Commission,* 222 Conn. 98, 108–109, 608 A.2d 672 (1992). Accordingly, we conclude that the commission took valid action on the subdivision application when it modified the lot configuration of the corporation's subdivision application by reducing the number of lots thereon to sixteen and approved it, as modified.

B

We turn now to a consideration of whether the commission acted improperly in conditioning approval of the subdivision application on the corporation's ability to obtain approval from the DPUC. In *Carpenter* v. *Planning & Zoning Commission,* supra, 591, the applicant advanced the same argument with respect to a planning commission's approval of a subdivision plan " 'subject to posting a bond and approval of the highway superintendent.' " We held that "where a commission makes the approval of a plan of subdivision subject to a condition, the fulfillment of which is

---

[6] See also § 3 (e) of the Sherman subdivision regulations, which provides in part: "All land to be subdivided shall be of such character that each lot intended to be used for building purposes can be so used without danger to health or the public safety. Land subject to flooding or with inadequate means of potable water supply and sanitary sewage disposal shall not be plotted or approved."

within the control of neither the commission nor the applicant, such as approval by a coordinate municipal agency, the commission has 'failed to act' within the intendment of General Statutes §§ 8-26 and 8-28, unless the coordinate agency approval appears to be a reasonable probability." Id., 592–93. Because in *Carpenter* there was no indication in the record that the approval of the highway superintendent was a reasonable probability, we concluded that the commission had not taken valid action within sixty-five days of the submission of the applicant's subdivision plan and that the plan was, therefore, automatically approved at that time. Id., 593.

In order to respond to the corporation's claim of automatic approval, we must examine the record in this case to determine whether DPUC approval was a reasonable probability. Following an August 5, 1979 petition by The Timber Trails Property Owners Association, the DPUC conducted an investigation regarding the adequacy of water service being provided by the corporation. On August 31, 1979, the DPUC rendered a written report in which it made certain findings of fact[7] and ordered the corporation to comply with five specific requirements in providing water service.[8] A certified

---

[7] The report contains the following findings of fact:

"1. The Timber Trails Water Company, by supplying more than 50 customers, is a public service company subject to the Division's regulation as provided by Section 16-1 of the Connecticut General Statutes.

"2. Service complaints have been experienced by customers on both of the Company's unconnected systems.

"3. The existing two-inch pipe is inadequately sized to meet the demands of the system and is indicated to be in disrepair and in need of replacement.

"4. The Company has charged a rate for water which was not approved by this Division.

"5. The Company has not been operating the Company in compliance with all the regulations and Statutes governing water companies."

[8] The report provided: "As there is merit to the Customer's petition, the Company is hereby directed to comply with the following:

"1. The Company shall charge $80 per customer per year effective for service rendered on and after January 1, 1980; and such rate shall be clearly and separately delineated from the other non-utility related assessment

copy of this report was introduced into evidence at the September 28, 1979 public hearing on the subdivision application. In order to obtain approval, the DPUC required that the corporation: (1) change the rate it had charged its customers; (2) familiarize itself with state regulations governing water companies and comply with those regulations; (3) within ninety days of the DPUC decision, install production meters on unmetered wells and maintain production records; (4) within ninety days of the DPUC decision, submit drafts of a revised billing form that would comply with applicable regulations; and (5) within 120 days of the DPUC decision, submit evidence that it had chlorinated a certain well and maintained a flushing program recommended by the Department of Health Services.

By enumerating five explicit requirements with which the corporation had to comply in order to obtain its approval, the DPUC essentially placed *the corporation* in control of whether its water system and subdivision plan would be approved. Approval was certain once the corporation had complied with the stated requirements. Unlike the scenario in *Carpenter* in which there was

charges. Likewise, starting immediately, the revenues and expense accounts of the water utility operation shall be separately maintained in accordance with the Division's Uniform System of Accounts.

"2. Effective immediately, the Company shall become more familiar with the Regulations Governing Service Supplied by Water Companies of the Regulations of Connecticut State Agencies as detailed in Sections 16-11-50 through 16-11-98 and 16-3-100, and be prepared to submit evidence of compliance on request of the Division.

"3. Within 90 days of this Decision, the Company shall submit evidence to the Division that it has installed acceptable production meters on all its unmetered wells and is maintaining accurate periodic production records.

"4. Within 90 days of this Decision, the Company shall submit drafts of a revised bill form and rules and regulations to this Division for review and approval.

"5. Within 120 days of this Decision, the Company shall submit evidence that it has chlorinated Well No. 7 and is maintaining a periodic flushing program in accordance with the recommendation of the Department of Health Services."

nothing in the record to indicate the requirements for obtaining the approval of the highway commissioner or the likelihood of doing so, the conditions for obtaining DPUC approval were clearly delineated in this case and could readily be met by the corporation. Furthermore, the requirements do not appear overly burdensome or complex, as suggested by the time frame for their fulfillment indicated in the DPUC report. Consequently, we conclude that the conditions could be fulfilled by the corporation within a reasonable time. Id., 593 n.7.

Another factor that distinguishes this case from *Carpenter* is the existence of local regulations specifically addressed to the maintenance of adequate drainage and sewage systems for the protection of the public health. As we noted in *Nicoli* v. *Planning & Zoning Commission,* 171 Conn. 89, 94, 368 A.2d 24 (1976), with respect to the condition of approval that a road within the proposed subdivision be connected to an existing public street or highway in the town, the local regulations governing subdivision roads "provide sufficient authority for the imposition of the condition by the [commission]." Section 3 (e) of the Sherman subdivision regulations provides that "land contiguous to brooks, rivers, bodies of water or other areas subject to flooding [shall have] adequate provisions . . . made for drainage and flood control" and that "brooks, rivers or other bodies of water will not suffer from pollution by virtue of any sewage disposal system or other development of any kind which may be installed in such areas." Section 3 (e) also provides: "All land to be subdivided shall be of such character that each lot intended to be used for building purposes can be so used without danger to health or the public safety. Land subject to flooding or with inadequate means of potable water supply and sanitary sewage disposal shall not be plotted or approved." These regulatory provisions autho-

rized the commission to take reasonable measures to ensure that the corporation would maintain an adequate water system, which would not pose a threat to public health. Because the condition of DPUC approval was a valid exercise of the commission's police power according to the regulations governing it and because the corporation probably could have complied with the condition within a reasonable time, we reject the corporation's claim that the commission's decision to make its approval conditional was tantamount to a failure to take action on the subdivision application within the meaning of General Statutes § 8-26.

## II

In the second case the corporation contests the standing of the association to appeal to the Superior Court from the decision of the commission. In *Connecticut Assn. of Health Care Facilities, Inc.* v. *Worrell,* 199 Conn. 609, 508 A.2d 743 (1986), this court approved representational standing as delineated by the United States Supreme Court in *Hunt* v. *Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977): "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

The corporation challenges the standing of the association to represent its members on three grounds: (1) the evidence does not establish aggrievement on the part of any of the members of the association; (2) our decision in *Worrell* established a new rule of standing that should not be applied retroactively to this appeal,

which was commenced approximately six years before its announcement; and (3) the rule of representative standing in *Worrell* should not apply to zoning appeals. We reject these challenges to the standing of the association.

The claim that the trial court's finding of aggrievement is not supported by the evidence is without merit in view of the testimony of a real estate expert, referred to in the memorandum of decision, that the properties owned by the five named plaintiffs, most of whom were members of the association and one of whom still remains a member,[9] would depreciate by 5 percent or 10 percent if either the original or the modified subdivision plan should become effective. We are also unpersuaded that *Worrell* should not be applied to pending cases, because it does not contract but expands the opportunity for litigants to have their substantive claims determined on their merits. Procedural decisions involving jurisdiction, such as standing to appeal, are generally held to be retroactive and to apply to pending cases. See *Firestone Tire & Rubber Co.* v. *Risjord,* 449 U.S. 368, 101 S. Ct. 669, 66 L. Ed. 2d 571 (1981); *Neyland* v. *Board of Education,* 195 Conn. 174, 487 A.2d 181 (1985).

The corporation argues that representative standing is inappropriate in zoning appeals because of the requirement of General Statutes § 8-8 that an appeal be taken by a "person aggrieved" by the decision and the absence of such aggrievement on the part of those association members whose land is too distant from a proposed development to be affected. One of the req-

[9] See footnote 1, supra. Edwin Barber has remained an owner of property in the Timber Trails development and a member of the association throughout these proceedings.

uisites recognized in *Worrell* for standing by an association is that "its members would otherwise have standing to sue in their own right." *Hunt* v. *Washington State Apple Advertising Commission*, supra, 343. The presence in the appeal of the named plaintiffs,[10] whose aggrievement has been adequately established, satisfies that requirement. The corporation contends, however, that there is no evidence that all members of the association were aggrieved or that all of them have a significant interest in the decision. We have implicitly rejected the notion that aggrievement must be universal among the membership of an association before it may have representative standing. In *State Medical Society* v. *Board of Examiners in Podiatry*, 203 Conn. 295, 304–305, 524 A.2d 636 (1987), we approved representative standing for a statewide organization of physicians, many of whom would have had no interest in the treatment of ankles because of the nature of their specialties, in a suit to determine whether the practice of podiatry included treatment of ankle problems. One of the purposes of representative standing, to provide individuals with a method for cooperatively financing litigation affecting their interests that few could otherwise afford, is particularly applicable in zoning cases and has led one court, prior to the advent of *Hunt* v. *Washington State Apple Advertising Commission*, supra, to acknowledge "the particular need in zoning cases for a broader rule of standing." *Douglaston Civic Assn., Inc.* v. *Galvin*, 36 N.Y.2d 1, 6, 324 N.E.2d 317, 364 N.Y.S.2d 830 (1974).

We agree with the trial court that the association has established its standing to represent those of its members who have been aggrieved by the decision of the commission.

---

[10] See footnotes 1 and 9, supra.

## III

In the association's appeal from the approval of the sixteen lot subdivision, the trial court relied wholly on the failure of the plan approved by the commission to satisfy the minimum area requirement of 80,000 square feet established by the October 2, 1978 amendment to the zoning regulations in holding that the sixteen lot subdivision had been approved illegally. Our decision in *Timber Trails I,* which has invalidated that amendment, necessarily removes that basis for sustaining the association's appeal in the second case. Although the association argues to the contrary, claiming that the corporation must be deemed to have waived the illegality of the zoning amendment with respect to the second case by failing to plead it as a special defense, we can hardly ignore our determination in *Timber Trails I* that the amendment was a nullity. The association has not been prejudiced because these consolidated cases were tried together with the companion case of *Timber Trails I,* even though they were not consolidated with that case, and the implications of a decision invalidating the amendment involved in *Timber Trails I* were readily apparent.

In addition to a violation of the minimum lot area requirement, the association in its appeal from the commission alleged several other grounds, which the trial court did not reach, in support of its claim that the commission, in approving a modified subdivision plan, had "acted illegally, arbitrarily and in abuse of the authority and discretion vested in it." At trial, the association, as indicated by its trial brief,[11] pursued three of

[11] In its original brief as an appellee in this court, the association did not discuss the additional grounds included in its complaint and briefed at trial as an alternative basis for sustaining the judgment of the trial court, which had relied solely on the minimum lot area requirement of the October 2, 1978 amendment that we invalidated in *Timber Trails I* to sustain the associ-

these additional grounds in claiming that the evidence before the commission did not support its decision: (1) the requirement of the subdivision regulations for an adequate water supply was not met; (2) the requirements for protection of water quality and for adequate drainage and sewerage were not satisfied; and (3) the roads and bridges for the subdivision as approved were not properly arranged nor of sufficient width to provide an adequate and convenient system for present and prospective traffic needs.

A

As we noted previously, § 3 (e) of the Sherman subdivision regulations provides that "[l]and . . . with inadequate means of potable water supply and sanitary sewage disposal shall not be plotted or approved." There is no public water supply in the town of Sherman and most residents obtain water from wells. The Timber Trails development, however, operates its own private water system. The association maintained at trial that there was no basis in the record before the commission for finding that the water supply system would be adequate to serve the additional demands that would result from the development of the sixteen lot subdivision the commission had approved. There was evidence that the DPUC had investigated complaints of existing customers and had found several deficien-

---

ation's appeal. During oral argument, after questioning by this court about the consequences that a decision in *Timber Trails I* invalidating that amendment would have on the issues in these cases, permission was granted to all parties for supplementary briefs on that subject. The association included in the appendix to its supplementary brief excerpts from the trial briefs that it and the corporation had filed. The supplementary brief of the corporation does not address the merits of the alternative grounds advanced in the trial court by the association for reversing the commission's approval of the sixteen lot subdivision. The commission's supplementary brief does contain a detailed review of the record before the commission in attempting to justify the modifications made by the commission in the plan submitted by the corporation.

cies, such as interruptions of water service, sedimented and discolored water, inadequate water pressure and inadequate source of supply. The corporation in its trial brief argued, however, that those complaints related primarily to the water delivery system presently installed and were irrelevant to the area of the proposed subdivision, which would be serviced by new installations.

Undoubtedly the commission was seriously concerned with the problems relating to the water supply system, because it conditioned its approval of the subdivision plan as modified on approval of the system by the DPUC. Nothing in the record indicates that such a resolution of the conflicting claims of the association and the corporation over the adequacy of the water supply was inappropriate or beyond the broad discretion of the commission in determining factual issues. *Griffin Hospital* v. *Commission on Hospitals & Health Care,* 200 Conn. 489, 495–96, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986). Such reliance on a state agency with greater experience and competence in the supervision of the operation of private water supply systems cannot be deemed arbitrary or unreasonable as a matter of law.

B

The association also claimed that the requirement of § 3 (e) of the regulations for adequate sanitary sewage disposal was not satisfied by the evidence presented to the commission at the hearing on the corporation's proposal. No public or private sewage disposal system is available in Sherman, and the residents use septic tanks for that purpose. Section 3 (e) provides that before a subdivision may be approved, "a licensed professional engineer shall certify in writing . . . [t]hat each lot has been given a percolation test and a deep pit test in the approximate location of the proposed sewage disposal area for the lot, both in accordance with the proce-

dures and standards of the State Public Health Code . . . [and] [t]hat in his sound professional opinion, each and every lot shown on the subdivision plan has acceptable sites for a private sewage disposal system as prescribed in the regulations of the State Public Health Code . . . ." The association does not contend that this requirement was not satisfied by the corporation in submitting its subdivision proposal. It refers to the reports and testimony of several experts who had examined the site, indicating that there were "severe or very severe conditions which limit installation of septic systems" on many of the lots, geologic conditions "so hostile to septic systems that the chance for failures or other problems is great," and "questions about the capacity of each lot to dispose of sanitary wastes without polluting its soils and water and that of neighboring sites and the immediate vicinity."

The concerns advanced by the association relating to sewage disposal systems for the twenty-two proposed lots and the need to safeguard the purity of a lake and several streams on the property are reflected in a memorandum of the chairman of the commission prepared after several public hearings on the corporation's proposal. The commission responded to these concerns by imposing several modifications on the corporation's proposal, such as withholding approval of one of the lots until further testing provided assurance that a septic system could be installed with safety and combining several lots, with the result of reducing the number of approved lots to sixteen. Contrary to the association's claim, however, there was ample evidence to support the commission's approval of fewer lots than proposed by the corporation. A letter to the commission from the town sanitarian indicated that, despite various problems on the site relating to the installation of septic tanks, "it is possible for all lots to meet State Code Requirements, and it should be possible to

meet all Sherman Code Requirements, but I honestly can't guarantee it." The letter stressed the importance of critically appraising proposals for sewage disposal systems prior to approval for installation and rigorously inspecting the systems when completed to ensure compliance with state and local codes.

"The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." General Statutes § 4-183 (j). The decision of the commission to chart a middle course by modifying the corporation's twenty-two lot proposal so as to result in an approved subdivision of sixteen lots, rather than to deny or grant it in toto, is essentially a factual determination requiring the assessment of the credibility of testimony and the weighing of conflicting concerns. "It is not the function of the court to adjudicate the facts. The court can do no more, on the factual questions presented, than to examine the record to determine whether the ultimate findings were supported, as [§ 4-183 (g)] requires, by substantial evidence." *Persico* v. *Maher,* 191 Conn. 384, 409, 465 A.2d 308 (1983). From our review we conclude that there was substantial evidence to support the commission's implicit finding that adequate provision for sewage disposal on the sixteen lots approved would be made when permits for the construction of residences on the lots are issued and that the subdivision as approved did not lack adequate "means of . . . sanitary sewage disposal," as required by § 3 (e).

## C

Finally, the association claimed in its trial brief that the roads and bridges shown on the subdivision plan "are neither arranged nor of such width as to provide an adequate and convenient system for present and prospective traffic needs." The brief does not refer to any specific subdivision regulation that is claimed to

have been violated by the commission in approving the subdivision but does cite two provisions contained in the statement of purpose of the subdivision regulations, § 1: "(b) To provide for the integration of subdivided land into the land surrounding it [and] (d) To insure that land so subdivided may be used without danger to health and public safety." Section 1 of the regulations includes an additional purpose: "(c) To insure and regulate the layout of roads in accordance with sound engineering principles."

The town of Sherman has adopted an ordinance that specifies the minimum requirements for road construction, with which § 5 (e) of the subdivision regulations requires compliance for subdivision approval. Section IV of the ordinance provides for a minimum right of way of fifty feet and a minimum pavement of twenty-four feet. It also contains various specifications concerning highway grades, sight line distances, curve radii, lateral slopes and other details of road design and construction. The association's brief does not claim that the roads shown on the subdivision plan violate any of these provisions.

One of the modifications of the subdivision plan made by the commission pertained to the road design and required the elimination of a dead-end spur road entirely. Presumably the commission was not persuaded that any other modifications of the road layout were necessary. Its members were not compelled to accept at face value the proposition of the association that the addition of sixteen new homes in the area would create so much more traffic on the roads of the development as to endanger the public safety. As we have previously observed, on factual questions of this nature a reviewing court cannot substitute its judgment for that of the agency.

We conclude that the association cannot prevail on the alternative grounds advanced in its complaint for reversing the commission's approval of the subdivision plan as modified.

The judgment in the first case, in which the trial court dismissed the appeal of the corporation from the refusal of the commission to approve its subdivision plan for twenty-two lots without modification, is affirmed. The judgment in the second case, sustaining the plaintiffs' appeal from the commission's approval of a modified sixteen lot subdivision, is reversed, and the case is remanded with direction to render judgment dismissing the plaintiffs' appeal.

In this opinion the other justices concurred.