[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. Statement of the Case
Before the court is an administrative appeal brought by the plaintiffs, Peter and Virginia Petrides (Petrides)[1] from a decision of the Town of Groton Planning Commission (Commission), granting approval, with modification, of a re-subdivision known as Sedgewyck located near Flanders Road in the Town of Groton.
In approving the application, the Commission acted pursuant to Connecticut General Statutes § 8-26. The plaintiffs properly appeal the decision of the Commission pursuant to Connecticut General Statutes § 8-8(b).
II. Procedural History
The decision of the Commission was published in The Day
on September 24, 1993. The plaintiff served a writ, summons and complaint on the Groton Town clerk and the chairman of the Groton Planning Board on October 7, 1993. Thereafter, the writ, summons and complaint was filed with the clerk of the New London Superior Court on October 28, 1993.
By a motion dated November 12, 1993, and filed with the court on November 19, 1993, Leeward Realty Holding, Inc. (Leeward), moved to be made a party defendant on the ground that it was the actual applicant for the re-subdivision before the Commission. Said motion was granted by the court (Austin, J.) by agreement of the parties on March 18, 1996.[2]
On March 16, 1994, the Commission filed its return of record with the court. On March 3, 1994, the plaintiffs filed their brief in support of the appeal. Finally, on March 10, 1995, the defendant Leeward filed its reply brief which was CT Page 2003 subsequently adopted by the Town of Groton by a notice dated March 20, 1995.
III. Facts
By an application dated January 22, 1993, and filed with the Planning Board on March 4, 1993, Leeward Realty sought permission to develop a 78 lot "open space" subdivision on a 45 +/- acre parcel identified on Assessor's Map 107, Block 107-172, lots s-1 through s-50 near Flanders Road in Groton, Connecticut. (Record Item No. 1).
On April 13, May 11, and May 25, 1993, the Planning Commission held public hearings on the application. (Record Item No. 7). The voluminous transcripts of these hearings reflect that the Commissioners heard testimony from many local agencies including the Public Works Department, the Fire Marshall, Parks and Recreation, traffic agencies and members of the public. According to the minutes of April 13, 1993, the predominate concerns of the planning staff were "traffic, access, open space and active recreation." (Record Item No. 7, Minutes, April 13, 1993, p. 2).
On September 14, 1993, by a vote of 3-2, the Planning Board approved the Sedgewyck Re-subdivision with the following relevant modifications:
 1. In order to insure the proper provision of public water to the proposed subdivision, the final plan include a note specifying that the developer shall complete the proposed system interconnection with the approval of the state Department of Health Services and State Department of Public Utility Control, as may be required, and that the interconnection of the water systems be completed prior to the issuance of any building permits or the sale of any lots. Furthermore, the plans shall note that the construction of the water system up to and including the proposed booster pump station shall be completed prior to the clearing of any land for lot development and/or road construction.
 2. The final plan include provisions for installation of fire hydrants in the event that future water system upgrades result in adequate CT Page 2004 flow pressure for fire suppression. This work shall be completed in accordance with Section 4.5(2) of the Subdivision Regulations.
 3. The final plan include a note which specifies that the requirements of NFPA for residential sprinklers in individual homes must be met on all lots, the requirements for which shall be incorporated into all applicable deeds of conveyance. This requirement is made necessary by the fact that this application is made under Section 6.4, Open Space Subdivisions, of the Zoning Regulations, and must remain in effect until improved water flows, capable of providing for fire suppression and approved by the Fire Chief, are made available to this subdivision.
The plaintiffs challenge the decision of the Planning Commission on the grounds that (1) the application was defective in that it failed to list all adjacent property owners and provide proper notice to the same; (2) that the Commission failed to meet its statutory duty to assure proper respect for the public health, safety and welfare with specific reference to the traffic, fire protection, including fire hydrants and water supply. The plaintiffs main contention with regard to water rests on modification 1. Since the proposed interconnection of two independent water franchises requires the approval by the Department of Public Utility Control (DPUC), the plaintiffs assert that modification 1 represents a conditional approval of the subdivision which is contrary to the mandates of Connecticut General Statutes § 8-26.
IV. Jurisdiction
Under Connecticut General Statutes § 8-8(1), "an aggrieved person means a person aggrieved by a decision of a board and includes any . . . board or bureau of the municipality charged with enforcement of any . . . decision of the board. In the case of a decision by a . . . planning commission . . . `aggrieved person' includes any person owning land that abuts or is within a radius of one hundred feet of any parcel of land that is the subject of the planning commissioner's decision." On November 11, 1995, the court (Austin, J.) heard testimony from Peter Petrides who testified that he lived CT Page 2005 within 100 feet of the proposed re-subdivision. There seems to be no dispute that the 30 other named plaintiffs are either abutters to the subdivision or live 100 feet from it. Therefore, based on the testimony of Peter Petrides, the court finds that the plaintiffs are aggrieved by the decision of the Planning Commission and have standing to prosecute this appeal.
V. Standard of Review
The standard of review for an administrative appeal from a planning commission is extremely limited. "It is axiomatic that a planning commission, in passing on a [re-subdivision] application, acts in an administrative capacity and is limited to determining whether the plan complies with the applicable regulations." Gorman Construction Co., v. Planning andZoning Commission, 35 Conn. App. 191, 195, 664 A.2d 964
(1994). "This is an administrative function, neither legislative nor judicial." Gagnon v. Municipal PlanningCommission, 10 Conn. App. 54, 57, 521 A.2d 589 (1987).
"The trial court must determine whether the commission has correctly interpreted its regulations and applied them with reasonable discretion to the facts." GormanConstruction Co., v. Planning and Zoning Commission, supra,35 Conn. App. 195. "[W]hen a zoning authority has stated the reasons for its actions, the reviewing court ought to examine the assigned grounds to determine whether they are reasonably supported by the record and pertinent to the considerations the authority was required to apply. . . ." Beit Havurah v.Zoning Board of Appeals, 177 Conn. 440, 444-45, 418 A.2d 82
(1979). "The trial court can sustain the [plaintiff's] appeal only upon a determination that the decision of the commission was unreasonable, arbitrary or illegal. . . . It must not substitute its judgment for that of the . . . commission and must not disturb decisions of local commissions as long as honest judgment has been reasonably and fairly exercised."Gorman Construction Co. v. Planning and Zoning Commission,
supra, 35 Conn. App. 195.
VI. Discussion
 A. Subject Matter Jurisdiction
The plaintiffs allege a jurisdictional defect in the CT Page 2006 application of Leeward in that it "failed to list all adjacent property owners and provide proper notice to the same. " (Plaintiffs' memorandum, p. 2). Thus, the plaintiffs question the subject matter jurisdiction of the court. "Once an issue of subject matter jurisdiction has come to our attention, we cannot adjudicate a case on its merits without first determining whether we have the authority to proceed." Simmsv. Warden, 229 Conn. 178, 180, 640 A.2d 601 (1994).
Section 2.1 of the Town of Groton Subdivision Regulations states, in part, that, "[a]ll prospective applicants for subdivision approval shall submit an application to the Commission and receive approval by the Commission in accordance with these regulations. . . . Section 2.3(1)(a) and (b) mandates that the application be submitted on forms available from the Commission and that it "[i]nclude all the information required in Section 3 of these regulations."
A review of the application form reveals that there is no requirement that the applicant list the names of all adjacent property owners. (Record Item No. 1). Section 3.1(2)(a) of the Regulations does mandate that the "final plan shall show . . . the location of property with respect to surrounding property and streets, the names of all adjoining property owners of record. . . ." Thus, the application given to the applicant may not conform to the Regulation's requirements, but the applicant is required to use the forms supplied by the Commission. Such a defect is merely technical and not jurisdictional.
Furthermore, the court's own review of the General Statutes applicable to Planning Commissions[3] reveals that there is no requirement that an application list the names of all adjacent property owners and give specific notice thereto. The plaintiffs' reliance on Timber Trails Corp. v. Planning Zoning Commission, 222 Conn. 374, 610 A.2d 617 (1992) for the proposition that the failure to list such names on the application creates a jurisdiction defect is wholly inaccurate.
Timber Trials concerns the failure of a Planning Commission to file proposed changes of its planning regulations with the town clerk prior to their formal adoption. In construing General Statutes § 8-31(a), the court rejected the Commission's position that the publication of the CT Page 2007 proposed changes was adequate to meet the statute's requirements. The court held that strict "compliance with the statutory procedure was a prerequisite to any valid and effective change to [planning regulations]." Id. 378.
In this case, however, we are concerned with an application for re-subdivision and not a change to existing subdivision regulations. The record does reflect that notice of the proposed re-subdivision and the date of the first public hearing on the matter was published in The Day on April 2 and 9, 1993. (Record Item, No. 2). Therefore, their being no specific statutory requirement mandating that adjacent property owners to a proposed subdivision be given actual notice of the plan and/or be listed on the application, the court finds that the applicants did not have to supply such information on its application. Leeward's failure to do so does not deprive the court of jurisdiction to hear this appeal.
B. Public Health, Safety Welfare: Traffic
In its brief in support of the appeal, the plaintiffs allege that the Commission failed in its statutory duties to protect the publics' health, safety and welfare by its alleged failure to properly address the increased traffic, and other related issues created by the re-subdivision.
In support thereof, the plaintiffs point to the fact that the re-subdivision was approved by a vote of 3-2 with two dissenting members (Roper and Finn) specifically withholding their approval of the plan based on their concerns of increased traffic and safety. (Record Item No. 7, Minutes, September 14, 1993, p. 3). In reviewing the decision of the Commission, the court cannot substitute its judgment for that of the board no matter how close the vote." If it appears that the commission has reasonably and fairly exercised its honest judgment after a full hearing, the trial court must be cautious about disturbing the decision of the [commission]."Reybestos-Manhattan, Inc. v. Planning Zoning Commission,186 Conn. 466, 469, 442 A.2d 65 (1982).
The record adequately reflects that the Commission acted reasonably and adequately in an effort to address traffic concerns. CT Page 2008
First, the developer hired a traffic engineering firm, Fred Hesketh Associates, to study traffic flows and the impact that the re-subdivision will have on existing roadways. (Return of Record, p. 6.) The record indicates that the study was conducted using peak flow summer traffic, and takes into account peak times during the day when people may be leaving for and returning from work. (Return of Record, p. 6.) Moreover, the complete detailed report of the engineer was presented to the Commission for their review and study. (Record Item No. 62.)
Of particular interest to the court is the conclusion of the engineer's report that:
 [B]ased upon our review of roadway and traffic conditions existing in the vicinity of the Bel-Aire Subdivision in Groton, it is our opinion that the introduction of a new subdivision with 78 single family homes on property to the north of the Bel-Aire Subdivision with new subdivision roadways intersecting Flanders Road one-half mile north of Route 1 and connecting to Ridgewood Drive opposite the intersection of Oakwood Drive, will not create any adverse traffic conditions.
(Return of Record, p. 7).
Even with the favorable findings of the traffic engineer, the record reflects that the Commission continued to study the issue in response to the public's general concern. The director of planning sought specific input from the local traffic authority (Record Item No. 41), who subsequently concluded, by a memo dated May 21, 1993, that the connection of the proposed re-subdivision with an adjacent existing one (Bel-Aire) "would be very positive from an emergency access point of view. This may allow greater efficiency in emergency response as well as allowing re-routing traffic from Route 1 during an extreme emergency." (Record Item No. 27). The traffic authority addressed a concern that connecting the two subdivisions would cause increased traffic and speeding on Bel Aire, but concluded that "the streets can handle the increased volume of vehicular traffic." (Record Item No. 27).
Even with two favorable reports, the Commission continued to study traffic concerns and looked into designating one of CT Page 2009 the main streets as one-way (Record Item No. 15), eliminating the interconnection altogether and substituting a new boulevard-type entrance called Victoria Drive (Record Item No. 17); a position that was later rejected.
Based on all of the above, the court concludes that the Commission went to great lengths to meet the statutory and regulatory requirements that "proper provision shall be made that . . . the proposed streets are in harmony with existing or proposed thoroughfares shown in the plan of development. . . especially with regard to safe intersections with such thoroughfares, and so arranged and of such width, as to provide an adequate and convenient system for present and prospective needs." General Statutes § 8-25. In fact as part of the re-subdivision approval, the Commission specifically noted that it will ask the traffic authority to monitor the traffic patterns to determine the need for street signage and other traffic controls.
The court concludes that the Commission, after careful study of the traffic issues, came to a reasonable conclusion based on its own honest expertise and judgment. Their decision is fully supported by the record, and should not be disturbed.
C. Public Welfare, Health and Safety: Fire Protection
The plaintiffs also assert that the defendant Commission failed in its statutory duty to promote the health and safety of its residents with specific regard to fire protection. The plaintiffs take issue with the fact that the homes in the re-subdivision are to be equipped with residential sprinklers "until improved water flows, capable of providing for fire suppression and approved by the Fire Chief, are made available to [the] subdivision." (Record Item No. 7, Minutes, September 14, 1993, p. 2).
By not mandating fire hydrants, the plaintiffs assert that the Commission has failed to protect the public health and safety. The plaintiffs claim that the application should have been rejected outright until adequate water for hydrants could be obtained.
Again, however, the court cautions that its role is not to revisit the entire issue, but to review the record to ensure CT Page 2010 that the Commission's recommendations and approval were adequately based.
Under Section 4.5(2) of the Town of Groton's Subdivision Regulations, "[w]here public water is available or required, fire hydrants may be required where necessary to insure the public health and safety." (Emphasis added. ) Thus, by the Regulation's own terms, the decision to require fire hydrants in a subdivision is a discretionary matter left to Commission's best judgment. The record reflects that the Fire Marshall approved the use of residential sprinkler systems as long as they met NFPA standards (Record Item No. 7, Minutes, May 11, 1993, p. 3). Additionally, the record reflects that the issue of fire protection was discussed numerous times during the public comments portion of the public hearings. A memo dated June 8, 1993, (Record Item No. 21), prepared by the planning commission's staff to the commission, notes that the fire marshall had approved the use of residential sprinklers. The record further reflects that the Commission specifically requested that the NFPA regulations go to the Commission staff for independent review. (Record Item No. 31).
Thus, much like the issue of traffic control and flow, the record is replete with references where the Commission discussed fire protection, the adequacy of sprinklers and other related issues. Exercising its own judgment, the Commission concluded, based on the evidence before it, that the residential sprinkler systems would provide adequate fire protection. The court cannot and must not substitute its judgment for that of the Commission, and finds the conclusions of the Commission adequately supported by the evidence in the record.
D. Conditional Approval: Water Supply
Lastly, the plaintiffs allege that the Commission improperly conditioned approval of the re-subdivision subject to a proposed water interconnection between two separate water supplies to ensure adequate water supply to the new development. This so-called conditional approval is contained in the Commission's modification 1 which states in part that "the developer shall complete the proposed interconnection with the approval of the state Department of Health Services (DOHS) and state Department of Public Utility Control (DPUC), as may be required . . . ." CT Page 2011
Thus, the Commission approved the plan subject to the developer getting approval from certain state agencies allowing the interconnection of two distinct water franchises. "Nothing in the subdivision approval statute, § 8-26, allows for the imposition of conditions upon the planning commissions's approval of a subdivision plan; the statute merely provides for the commission to approve, modify and approve, or disapprove' a subdivision application." Carpenterv. Planning Zoning Commission, 176 Conn. 581, 592,409 A.2d 1029 (1979). In this case, approval was implicitly based on the condition that the interconnection would be acceptable to the relevant state agencies. "[W]here a commission makes the approval of a plan subject to condition, the fulfillment of which is within the control of neither the commission nor the applicant, such as approval by a coordinate municipal agency, the commission has `failed to act' within the intendment of General Statutes § 8-26 and 8-28 unless the coordinate agency approval appears to be a reasonable probability." (citation omitted; internal quotation marks omitted). Timber TrailsCorp. v. Planning Zoning Commission, 222 Conn. 380, 389-90,610 A.2d 620 (1992).
In order to determine whether approval by the DPUC of the proposed interconnection is a reasonable probability, the court must examine the state of the record. The first record item describing the requirements for Commission approval of the re-subdivision is from Douglas Crandall, general manager of the Southeastern Connecticut Water Authority (SCWA) who wrote that "`they' [the planning commission] will need some letter testimony to the effect that we can/will connect to Connecticut American and provide water service to 78 lot subdivision." (Record Item No. 67). This memo, however, only reflects that SCWA is willing to interconnect, but it does not state the status of any approval process of outside agencies. Later, in a letter to some of SCWA's current customers who would be affected by the interconnection, particularly those residents of the neighboring Bel-Aire subdivision, Crandall assured his customers that "nothing can happen without the approval of the Water Supplies Section of the Connecticut Department of Health Services whose public health responsibilities included capacity, water quality and system reliability." (Emphasis in original); (Record Item No. 42).
A memo of the planning commission staff summarizing a May CT Page 2012 21, 1993, telephone conversation with Bob Rivard of the DOHS, states in relevant part that, "[w]e discussed that the interconnect between SCWA and CAWCO[4] as recommended in DOHS water report." The memo continues that "[i]f P.C. [planning commission] approves with conditions (including DOHS approval ), the developer and water companies will need to apply to DOHS for approval and will need to provided detailed design plans and water reports. DOHS will not allow further degradation of SCWA service to existing companies." (Record Item No. 28)
Thus, as late as May 21, 1993, the record reveals that their is some sort of general agreement concerning an interconnection between SCWA and CAWCO, but nothing to reflect that either of the companies or the applicant has sought out a DOHS permit or some other guidance for probable approval. In a summary of issues memo on the Sedgewyck re-subdivision dated June 8, 1993, the Commission staff, under the heading "water" noted that "Hookup to CAWCO by SCWA to provide water to this subdivision — This has been approved in concept by DOHS." (Record Item No. 21).
In response to the Commission query "What happens if the water agreement does not materialize? Do we have a water agreement now?, James S. Butler, Director of Planning wrote in a memo dated June 17, 1993 that:
 The Planning Commission's responsibility under the Subdivision Regulations is to insure that potable water can be made available to the site. The Commission can not control the source of that water (in terms of water companies) as that authority lies with state agencies. If this particular water agreement did not materialize, the developer would have to find another state approved source of water or he could not construct this subdivision as proposed . . . . There is no final agreement in effect now although a Letter of Intent has been prepared. The proposed interconnection is an outgrowth of the 1988 DOHS water study. Before the agreement can be effectuated, Connecticut American Water Company will need state permission to sell water. Southeastern Connecticut Water Authority has prepared a Draft Agreement which places the burden on the developer to make the proposed CT Page 2013 interconnection in order to purchase water from SCWA.
(Record Item No. 20).
This response never mentions the likelihood of DPUC approval of the interconnection, nor lays out any steps that the applicant must take in order to obtain approval. More surprisingly, the answer reveals that no formal agreement has been entered into by the parties. Thus, in the opinion of the court, the record reflects that the whole scheme is speculative as late as June 17, 1993, and any approval is uncertain given the absence of any application for a permit or a definite agreement by the water companies.
Moreover, the minutes of the Commissions' prior meeting fail to clarify the status of DPUC approval. For instance, at the April 13, 1993, meeting, the minutes reflect that "the Commission must assure that a public water system is provided for domestic use. . . . The system is approved by the water utility and ultimately the Department of Heath Services." (Record Item No. 7, p. 4). One month later, on May 11, 1993, the minutes of the Commission reveal that a consulting engineer for the SCWA, John Lenard, told the board that the state Department of Heath Services is involved and will have to approve every step of the proposal." (Record Item No. 7). During the public comments section of the meeting, Peter Petrides stated in part:
 [W]hen I asked American Water, they laughed at me a little bit and said, hey we've been talking about this for eight years and nothing's ever happened. But before they could sell any water they would have to get a permit from the state. This has not been done. When I talked to Mr. Rivard of the state Department of Health, he said that he has not heard anything about this proposal to date. So the state Department of Health has not been contacted yet with what is being proposed. So they haven't approved it. I recommend and suggest that this plan not be approved unless all parties have agreed to it, and there's been a signed agreement.
(Return of Record, 85) CT Page 2014
In response, a Mr. Lenard stated:
 Well the gentleman was right that, yes, there was [sic] discussion with them, Mystic Valley Water Company, now American, went so far back that it used to be called Mystic Valley Water Company now it's American, and the state Health Department. There has been discussions, and discussions, and discussions, but nothing's happened. And of course there has been no detailed plan submitted. We already picked locations and made preliminary plans for the connection obviously, but nothing has been submitted or approved. And the only time the Health Department approves, is they see every nut and bolt detailed out. And of course this hasn't been done at this point.
(Return of Record, 87).
Based on this record, the court would be hard pressed to conclude that the proposed interconnection of the water systems and the needed approval of the DOHS is a reasonable probability. In fact, the documents submitted reveal that the water companies themselves have not entered into a formal agreement for the interconnection, and that no formal permit or approval has been sought from the DOHS. While the concept of the interconnection may have been discussed and been generally agreeable to the DOHS at some point in time, there is no evidence that their approval is a reasonable probability given the fact that no plan has even been submitted.
Thus, the court finds that the Commission acted outside the scope of its statutory authority in approving the subdivision plan with modification number 1 because it requires approval by a state agency, and such approval, based on the record, does not appear to be a reasonable probability. "The applicable provisions of General Statutes § 4-183(g) [now § 4-183(j)] permit the trial court to affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the [Commission's] decision. . . ." (Internal quotation marks omitted). Feinson v.Conservation Commission, 180 Conn. 421, 429, 429 A.2d 910
(1980). When a court overturns agency action because of a lack of sufficient findings, the court must remand the matter back to the local agency for further consideration. GormanCT Page 2015Construction Co. v. Planning Zoning Commission, supra,35 Conn. App. 199.
The court further finds that the water supply and proposed interconnection is an integral part of the re-subdivision's plan for fire protection and potable drinking water, and can not be separated out of the approval or modified by the court. Id. 200.
Therefore, the court remands the case to the Commission for further clarification and findings of fact with regard to the water interconnection and the likelihood of approval by the appropriate state agencies. The court also finds that the issue of traffic has been adequately addressed by the Board and therefor dismisses the appeal as to that part.
VII. Conclusion
For the above stated reasons, the appeal of the plaintiffs is affirmed in part, and dismissed in part with direction that the matter be remanded to the Commission for further findings consistent with this opinion.
Austin, J.