745 A.2d 1000

**CITY OF ANNAPOLIS**

v.

**Mareen WATERMAN et ux.**

**No. 37, Sept. Term, 1999.**

Court of Appeals of Maryland.

Jan. 7, 2000.

Reconsideration Denied March 8, 2000.

Paul Garvey Goetzke, City Attorney, Annapolis; Jonathan P. Kagan (Rignal W. Baldwin, Jr., Brassel & Baldwin, P.A., on brief), Annapolis, for petitioner/cross-respondent.

William M. Simmons, Annapolis, for respondents/cross-petitioners.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

Appellant, the City of Annapolis (City), appeals from a decision of the Circuit Court for Anne Arundel County, which principally involves the City's subdivision approval process as it applies to the three-phase, twenty-year plus processing of a residential development proposed by appellees, Mareen D. Waterman and Marian Waterman. Appellees filed suit against the City alleging that certain conditions contained in the subdivision approval applicable to their property constituted an unconstitutional taking of that property. Appellees' complaint alleged in relevant part:

15. ... [T]he City Council's decision to *take* all of Lot 1 results in an additional taking of 3,163 square feet over and above the 2,375 square feet required by Resolution R-20-76.

16. There exists no essential nexus between a legitimate state interest and the subdivision condition imposed by the City Council requiring Lot 1 of Section 3 to be dedicated entirely as a recreational space....

17. In requiring the dedication of this recreational space, the City Council has denied [appellees] all economically viable use of *Lot 1.* [Emphasis added.]

As relevant to this appeal, the claim before the circuit court was a claim only that the conditions imposed on Lot 1 constituted an unconstitutional taking of Lot 1. The trial court accordingly dealt with an alleged taking only of that lot. The circuit court found

that the Annapolis City Council impermissibly conditioned approval of the Plaintiffs' subdivision proposal where it ordered that Lot One of the Section III Proposal shall be dedicated as recreational space pursuant to Resolution R–20–76 and where it ordered that Lot One of the Section III Proposal shall not be approved for use as a residential dwelling lot.

Appellant presents the following issues for our consideration:

I. Whether the lower court erred in finding that conditions one and two of City of Annapolis Resolution No. R–47–95 constituted a "dedication" of a portion of appellees' property to the City as a public "mini-park."

II. Whether the lower court erred in failing to apply the "nonsegmentation" principle in its takings analysis by focusing only on proposed Lot 1 (the corner piece of the Parkway property) and not on the entire Parkway property.[1]

III. Whether the lower court erred in finding that conditions one and two of City of Annapolis Resolution No. R–47–95 constituted an unconstitutional taking despite the fact that appellees had not lost all economically viable use of their property.

IV. Whether the lower court erred in finding that conditions one and two of City of Annapolis Resolution No. R–47–95 failed to meet the Supreme Court's "rough proportionality test," and thus, constituted an unconstitutional taking.

V. Whether the lower court erred in awarding damages dating back to May 21, 1992 ... when the cause of

---

1. The "nonsegmentation" principle, with its attendant "denominator" parcel principle, arose primarily out of *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). The principle had been mentioned twenty-five years earlier in the "nuisance" regulation case of *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 596, 82 S.Ct. 987, 991, 8 L.Ed.2d 130 (1962).

action did not accrue until the passage of Resolution No. R–47–95 on December 11, 1995.

VI. Whether the lower court erred in calculating damages on the value of the entire Section III of the Parkway property (valued at $328,000), instead of on the value of Lot One (valued at $40,000) that was the only portion [a]ffected by conditions one and two of City of Annapolis Resolution No. R–47–95.

Appellees/Cross–Appellants pose several questions that appear to be counter arguments to appellant's questions, rather than separate questions. We shall treat them as arguments and address them, as necessary, in our discussion of the questions presented by appellant. Moreover, because we answer appellant's first three questions in the affirmative, and accordingly reverse the erroneous decision of the trial court, it is unnecessary to address appellant's remaining questions, or to address any of appellees' questions separately.

## I. Facts

Appellees purchased a three-acre triangular tract of land in Annapolis in the mid–1970's for the purpose of developing it. They proposed to develop the land, called "Parkway," in three phases. The last phase was designated as "Lot 4" during the second phase of development. While seeking subdivision approval of the first phase, appellees agreed to provide, in the subsequent phases of the subdivision, at least 2,375 square feet of recreational space for the use of the first-phase residents. Thus, the parties agreed to defer creating the recreational space needed for the first-phase residents until a later date. The language of the 1976 resolution stated in pertinent part "[t]hat the developer agree[s] to provide 2375 square feet of recreational space in an appropriate location as part of the future development of his remaining adjacent land *in addition to* any recreational area required by that development." City of Annapolis Resolution R–20–76 (Apr. 12, 1976) (emphasis added). In other words, the recreational area now at issue was required as a condition for approval of phase one (or Section I) in 1976. In return for not being required to

provide, at that time, recreational area within Section I for the use of Section I residents, appellees agreed to provide it in a future phase of development, in addition to providing recreational space for the needs of the residents of those future phases.

No timely challenge was made to the 1976 imposition of the future recreational area requirement. The parties to the agreement left the exact location of the agreed upon recreational space open for future approval. To some extent, the time of determining the specific location of the recreational space was dependent upon the development phase in which appellees chose to perform their part of the agreement. They put off creating the recreational space required for Section I until seeking subdivision approval for the last phase, Section III.

The 1976 agreement was incorporated as a condition into Resolution R–20–76 approving the first-phase subdivision. The following year, phase two was approved and developed. It did not contain the recreational space that appellees had agreed to provide for the first-phase residents. At that time, the remaining two contiguous triangular parcels were combined as Lot 4.

The third, and final, phase was submitted for subdivision approval in 1990. In this phase, appellees proposed to subdivide the final .87–acre parcel, Lot 4, of the development into five new lots. The five new lots were to be created from two contiguous triangular parcels that had been identified during the second phase of development as Lot 4. Four parcels of the final-phase subdivision were designated to be developed as eight duplex units. These four parcels were contained on one of the triangular parcels within Lot 4. The other triangular part of the original Lot 4 was redesignated on the proposed third-phase subdivision plat as new "Lot 1." The proposed new Lot 1 was located on the corner of Tyler Avenue and Hilltop Lane and consisted of 5,538 square feet. The proposed third-phase subdivision indicated that new Lot 1 would be used for a single-family residence.

The proposed third-phase subdivision also designated a 4,598 square foot "recreational easement" running behind and across the rear of the eight duplex units. It was appellees' contention that this proposed 4,598 square foot recreational area would satisfy the open space and recreational condition in the 1976 resolution that approved the first phase of the development.

The Department of Planning and Zoning (DPZ) recommended denial of appellees' third-phase subdivision request on the basis of alleged density and traffic problems. The Planning and Zoning Commission (Commission) agreed and recommended a reduction in the number of units, and also found that the third phase, as proposed, violated the recreational area condition incorporated in Resolution R–20–76, and further violated City subdivision regulations. Appellees appealed to the City Board of Appeals, which upheld the Commission's findings.

Appellees sought judicial review in the Circuit Court for Anne Arundel County. The circuit court, in that judicial review, reversed the decision of the Board of Appeals. The trial judge, Judge Bruce C. Williams, found:

> When the City Council approved the initial development of the Parkway property, its approval was conditioned on the inclusion of 2,375 square feet of recreational space on the property. [Appellees] propose[ ] to dedicate an easement across the rear portion of the duplex lots of the proposed subdivision to satisfy the recreational requirement. The Board of Appeals below held that such an easement would deprive ... each lot owner [the eight duplex owners] of his exclusive use of the property dedicated,[2] reducing the size of their lot below the requisite 3600 sq. ft. minimum.
>
> This Court finds that the Board of Appeals erred in finding that the lot size of each respective lot owner would

---

**2.** The lower courts throughout this process have misconstrued the 1976 agreement as a "dedication." As we explain, *infra*, it was not a dedication but a condition or, at most, a reservation of land, for future use as recreational space by the first-phase residents.

be reduced by the provision of an open space easement on their lot. The Annapolis City Code contemplates figuring recreation areas into, rather than out of, minimum lot size area calculations.... Section 21.74.050 D states, the area of land set aside for common open space or recreational use may be included in determining the number of dwelling units permitted.... Nothing in the Annapolis City Code authorizes such determinations by the Commission.

....

The Annapolis Comprehensive Plan does not support the exclusion of easement *dedicated* space in lot size calculations....

... With regard to residential lot configurations, the plan encourages the "establishment of block homeowners' associations, *with pooling of portions of long back yards as common open space or garden areas, owned and maintained by the associations.*" An easement would accomplish this goal. The City Council should be afforded the opportunity to determine whether an easement would be appropriate.

....

*This Court finds that in light of changes in the Annapolis City's zoning regulations since the passage of R–22–76, the issue of recreational space needs to be resolved by the Annapolis City Council and not the Planning and Zoning Commission....* The Commission's denial cannot be supported by substantial evidence or its statutory authority.

....

**ORDERED**, that the decision of the Board of Appeals is hereby **REVERSED** and that the Waterman subdivision plat be approved by the Planning and Zoning Commission to allow this case to proceed to the Annapolis City Council *in accordance with the statutory scheme established by the City of Annapolis and the State of Maryland.* [Third emphasis in original; all others added.] [Citations omitted.]

After the Board of Appeals affirmed the Commission's decision, but before Judge Williams had reversed the Board of

Appeals, the City enacted Ordinance O–2–93, which required site design review prior to subdivision approval. That site design review was to be done by the DPZ. Accordingly, after Judge Williams' reversal of the Board, appellees' subdivision application was resubmitted to the DPZ for site design review.[3]

Subsequently, pursuant to the site design review required by the newly enacted ordinance, the DPZ and the Commission again expressed their reservations about density and traffic problems in their submission to the City Council. The DPZ and the Commission recommended approval of the third-phase subdivision and recommended three conditions. One of the conditions was that the single-family dwelling proposed for new Lot 1 be relocated. In approving the subdivision, the City Council agreed with the recommendation and imposed a limitation that no dwelling be permitted on new Lot 1. Additionally, they imposed a separate condition that the 2,375 square feet of recreational area required by the conditions for approval of the first-phase subdivision, be located on new Lot 1. *See* City of Annapolis Resolution No. R–47–95 (Dec. 11, 1995).

Appellees responded by filing suit in the circuit court *for damages only*, alleging that the conditions attached to the approval created an unconstitutional taking of Lot 1. The circuit court found in favor of appellees and awarded damages. In the liability phase, the court's opinion initially stated:

The Plaintiffs allege that there has been an unconstitutional taking of their property to the extent that they cannot

---

**3.** Appellees argue that this submission of the subdivision plan to the DPZ violated Judge Williams' order. There is no indication in the record that any effort was made at that time to ask Judge Williams to clarify his order in that respect. Judge Williams' order required a forwarding of the subdivision application to the City Council "in accordance with the statutory scheme established by the City of Annapolis...." At the time of Judge Williams' order, the statutory scheme then in effect required the plans to be submitted to the DPZ for additional review pursuant to Ordinance O–2–93. The City had legislated faster than the parties had litigated. Moreover, the record contains a July 21, 1995, letter from appellees that appears to accede to the subsequent procedure. No estoppel issues are raised by appellees.

freely develop Lot One of the Proposed Section III Subdivision. Nor can the Plaintiffs exclude others from using Lot One....

... The use of the Plaintiffs' property [Lot One] as a mini-park would deprive the Plaintiffs of their right to exclude others....

... It has long been held that "a land use regulation does not effect a taking if it ... does not 'deny an owner of all economically viable use of his land.'" ...

. . . .

... The Court finds that the City's actions in applying the [recreational area and no dwelling] conditions ... are proper in light of the recommendations made to it by the various sources discussed above.... The actions taken by the City created a nexus whereby the interests of the City, most notably traffic concerns, were addressed by the imposed conditions and were a proper exercise of the City's police powers....

. . . .

... Rather, the condition imposed upon Lot One is an impermissible taking because it singles out only one small portion of the entire Section III Proposal where there was evidence before the Council which suggested that the entire Section III Proposal would adversely affect traffic at that location.

The circuit court went on to find an unconstitutional taking by focusing on Lot One:

[I]t appears to the Court that the *dedication* of Lot One as recreational space for use as a mini-park would prove to be at least as hazardous to traffic patterns ... as would a single family home.

. . . .

... [T]he Court finds that [the] City Council's condition ordering that Lot One of the Section III Proposal be dedicated as recreational space to serve as a mini-park is not reasonably related to the needs that would be created by the subdivision....

. . . .

> . . . [T]he Court finds that the actions . . . represent an impermissible taking . . . because the exactions made through the two conditions are not reasonably related to the impact [of] the proposed subdivision. . . . [Emphasis added.]

The City filed a timely appeal to the Court of Special Appeals and we granted a writ of certiorari prior to that court's review of the matter. We reverse the circuit court.

## II. Discussion and Analysis

Maryland Code (1957, 1998 Repl.Vol.), Article 66B, section 4.0l(a)(1), contained within the subtitle "General Development Regulations and Zoning," provides in relevant part that the policy of the State is to empower "municipal corporations . . . to regulate and restrict . . . the percentage of lot that may be occupied, . . . the size of yards, courts and other open spaces, . . . and use of . . . land for . . . residence or other purposes." [4] Within the subtitle "Subdivision Control," section 5.03(a) provides in relevant part that "the planning commission shall prepare regulations governing the subdivision of land within

---

**4.** In *Coffey v. Maryland–National Capital Park & Planning Commission,* 293 Md. 24, 27–28, 30, 441 A.2d 1041, 1042, 1044 (1982), we said, quoting in part from *Board of County Commissioners v. Gaster,* 285 Md. 233, 246, 401 A.2d 666, 672–73 (1979):

> As we noted . . . some confusion exists relative to the terms planning and zoning, which are not synonymous. Zoning is concerned with the use of property but planning is broader in its concept. . . .
> There are three integral parts of adequate land planning, the master plan, zoning, and subdivision regulations. . . . '[Z]oning ordinances are not calculated to protect the community from the financial loss which may result from imperfect development. Some of these purposes are sought through the imposition of subdivision controls.' . . .
> . . . .
> . . . If planning boards had no alternative but to rubber-stamp their approval on every subdivision plat which conformed with the zoning ordinance, there would be little or no reason for their existence. While planning and zoning complement each other and serve certain common objectives, each represents a separate municipal function and neither is a mere rubber-stamp for the other. [Citations omitted.]

its jurisdiction. Those regulations may provide for ... the adequate and convenient placement of ... open spaces for traffic, ... recreation, light and air and the avoidance of congestion of population...." Section 5.04 provides that planning commissions may "agree with applicant[s] upon use, height, area or bulk requirements or restrictions which are designed to promote the purposes of the zoning ordinance of the jurisdiction." The general purposes of the planning and zoning processes in the City are found in section 21.02.010 of the City of Annapolis Code (1996). They include:

A. To protect the public health, safety, general welfare of the community and to promote the public comfort, convenience and prosperity;

B. To ensure the integrity of, and help implement, the comprehensive master plan;

C. To foster a more rational pattern of relationships between residential, business, commercial and manufacturing uses for the mutual benefit of all;

. . . .

H. To provide adequate standards of light, air and open space;

I. To prevent the overcrowding of land and buildings and thereby to ensure proper living and working conditions and to prevent blight and slums....

In essence, planning commissions are authorized, presuming the respective jurisdictions have enacted proper subdivision controls, to review the plans for proposed subdivisions for compliance with the subdivision requirements (and compliance with separate zoning requirements). In that review process, in addition to insuring compliance, planning commissions attempt to encourage developers to accept design features deemed appropriate for each respective subdivision. During that process, appropriate conditions may be incorporated into a subdivision approval.

Albeit sometimes in the context of zoning ordinances, we have previously discussed the need and appropriateness of such governmental controls. We noted in *Board of County*

*Commissioners v. Gaster*, 285 Md. 233, 248–50, 401 A.2d 666, 674 (1979):

> How can a county effectively plan for capital expenditures for roads, schools, sewers, and water facilities if, without regard to preexisting plans, a developer, as proposed here, might place a settlement of 1,200 or more people in the middle of a previously undeveloped area, a settlement which would overtax school facilities and which would necessitate improvement of a road whose reconstruction had not been contemplated before 1990? Planning would be futile in such situations.
>
> In those instances the developer, not the constituted authority of the county, is in control of planning for the future of the county. . . .
>
> . . . In the case at bar we see no basic conflict between the zoning regulations and the subdivision regulations. If there were a conflict, the subdivision ordinance in this instance provides that the more restrictive provision shall prevail. Moreover, Art. 66B, § 3.08 specifies that once a master plan has been adopted by the local legislative body "no street . . . shall be constructed or authorized . . . until the location, character, and extent of such development shall have been submitted to and approved by the commission *as consistent with the plan* . . . ." [I]f this proposed subdivision were approved, the streets contemplated in it would be spewing traffic out onto a county road "which has poor vertical and horizontal alignment, poor sight distances, and narrow width [, a] road . . . not programmed for reconstruction before 1990." Given the provisions of § 3.08, this in itself was a sufficient basis for the disapproval of the subdivision plat by the commission.
>
> . . . The county here has preordained by its subdivision regulations that one who seeks to cut up a larger tract by creating a subdivision must not disrupt the master plan and that the subdivision must be compatible with that master plan. Likewise, many zoning ordinances specify relative to special exceptions that they shall be granted only if they are

compatible with and will not disrupt the master plan.[5] [Second alteration in original.]

We outlined some basic principles of governmental regulatory authority in respect to property in *Stevens v. City of Salisbury*, 240 Md. 556, 562–63, 567, 214 A.2d 775, 778, 781 (1965):

> After the close of the Revolutionary War, the ownership of property in this country has frequently been referred to as "allodial" in nature or that the property is held by "allodial tenure." In its strict sense, "allodium" means land owned absolutely, and not subject to any rent, service, or other tenurial right of an overlord; however, it has been, and is, uniformly recognized throughout this country that the ownership of property is subject to the rights of government to tax the property, to regulate reasonably its use and enjoyment under the police power of the States, and to take the same, upon payment of the value thereof, when needed for a public purpose.
>
> . . . .
>
> It is an accurate statement to say that every restriction upon the use and enjoyment of property is a "taking" to the extent of such restriction; but every "taking" is not a "taking" in a constitutional sense for which compensation need be paid.

Appellant has enacted subdivision controls pursuant to the authority granted it by Article 66B. Its subdivision regulations are found in Title 20 of the City Code. They provide, in relevant part, that "[t]he planning commission shall not approve a preliminary plat absent a specific finding that the plat meets the provisions of Chapter 21.98, Site Design Plan Review." City Code, § 20.24.170. Chapter 21.98 has a general intent clause, which provides:

---

**5.** Judge Marvin H. Smith's opinion for the Court in *Gaster* provides an extensive history of planning, zoning and subdivision matters in Maryland.

### 21.98.010 Intent.

The purpose of this chapter is to ensure that property is developed with sound planning and design principles while allowing flexibility of design. The intent is to ensure reasonable consideration of, among other things, ... orderly development, and the relationship between the built and natural environments.

Section 21.98.050(Q) also provides that site design plan review shall encourage open space: "Areas of usable open space should be provided on site in order to afford visual relief." [6] The duties of the DPZ are stated in section 21.98.100, including that it

shall review, approve, approve subject to modifications or disapprove ... the preliminary site design plan....

... In reaching its decision, the [DPZ] shall determine if:

A. The site design plan meets all of the requirements of the zone in which it is located;

B. The locations of the buildings and structures, open spaces, landscaping, and pedestrian and vehicular circulation systems are adequate, safe, and efficient;

. . . .

The [DPZ] shall not approve the site design plan if it finds that the development would not achieve a maximum of compatibility, safety, efficiency, and attractiveness; and the fact that a site design plan complies with all of the stated ... regulations ... shall not, be deemed by itself to create a presumption that the proposed site plan is compatible ... and, in itself, shall not be sufficient to require approval....

 To better understand the functions and public purposes of subdivision controls, it is important to note further that:

---

**6.** Neither the subdivision ordinance nor the site design ordinance contains a formula or methodology for computing open space or recreational area. The validity of these ordinances were not challenged on that basis.

Today, the primary purpose of subdivision regulation is integration of a new development into an existing community. . . .

Subdivision regulation is important for a variety of reasons. First, it enables a community to ensure (insofar as is possible) that a new development will "fit in" with the existing community character, that the existing community will be able to provide needed services . . . , and that the new development will be a safe and healthy place for its citizens to live. Second, in a broader sense, subdivision controls give local governments the opportunity to attempt to ensure the success of a new development. . . .

. . . .

. . . Common [subdivision] provisions include the regulation of . . . open space for recreation, light, and air. . . .

13 Richard R. Powell, *Powell on Real Property,* ¶¶ 873[1][a][i], 873[2][d][i], at 79D–8, 79D–30 (MB ed.1998) (footnote omitted).

It is well settled that conditions may be imposed by a municipal planning commission in connection with the approval of a proposed subdivision map or plan.

The subdivision of land has a definite economic impact upon the municipality and hence the regulation of subdivision activities has been sustained as a means by which the interests of the public and the general taxpayer may be safeguarded and protected. . . .

The imposition of reasonable regulations as a condition precedent to the approval of the subdivision of lands and the recording of plats thereof has been held not to violate any constitutional provisions respecting uniformity of taxation and not tantamount to the taking of private property for public use without just compensation. In *Krieger v. Planning Commission of Howard County,* [224 Md. 320,] 167 A.2d 885 ( [ ]1961), the Court of Appeals of Maryland held that requirements of subdividers that impose a limitation of access to highways did not constitute a taking of land in the constitutional sense.

3 E.C. Yokley, *Zoning Law and Practice*, § 17–8, at 71–74 (4th ed.1979) (footnotes omitted). "A subdivision plat may be disapproved for any number of reasons. It may be disapproved where it fails to comply with subdivision legal requirements, applicable zoning laws, or reasonable conditions imposed on the development." 8 Eugene McQuillin, *The Law of Municipal Corporations*, § 25.118.30, at 443 (3d ed.1991) (footnotes omitted).

Numerous courts have approved the imposition of reasonable conditions in the subdivision approval process. We said in discussing access conditions in *Krieger*, 224 Md. at 323, 167 A.2d at 886:

> If [the planning commission] could properly [adopt subdivision regulations], it was not arbitrary to enforce them by denying approval of a plan which did not conform. In the absence of constitutional objection the power of a municipal corporation to impose reasonable conditions upon the issuance of a permit can hardly be doubted.

In *Prudential Trust Co. v. City of Laramie*, 492 P.2d 971, 973 (Wyo.1972), the primary question for the Wyoming Supreme Court was "how much discretion does the city have in exercising its right to approve or reject a proffered plat[?]" The court opined:

> Our view is that the right and duty of the city to approve a plat necessarily carries with it the right to set reasonable and just prerequisites and requirements for approval of the plat, and in particular in the area of bringing the plat into conformity with other areas with respect to lots, blocks, streets, and the like.

*Id.* at 974.

The California Supreme Court in *Ayres v. City Council*, 34 Cal.2d 31, 37–38, 207 P.2d 1, 5 (1949), stated in respect to exactions *and* conditions that:

> Where as here no specific restriction or limitation on the city's power is contained in the Charter, and none forbidding the particular conditions ... it is proper to conclude that conditions are lawful which are not inconsistent with

the Map Act and the ordinances and are reasonably required by the subdivision type and use as related to the character of local and neighborhood planning and traffic conditions.

. . . .

With regard to condition 2, that an additional ten feet be reserved for a planting strip . . . the creation of the subdivision necessitated the restricted use to confine ingress and egress to and from the lots away from [the] Boulevard [and] to screen the lot owners from the traffic noises, fumes and views of the fast-moving traffic. . . .

Other types of conditions have been upheld as well, including recreational open space conditions. *See Coffey v. Maryland–Nat'l Capital Park & Planning Comm'n,* 293 Md. 24, 441 A.2d 1041 (1982) (ordinance requiring compliance with master plan); *Gaster,* 285 Md. 233, 401 A.2d 666 (relieving traffic and population density); *see also Pima County v. Arizona Title Ins. & Trust Co.,* 115 Ariz. 344, 565 P.2d 524 (Ariz.Ct.App.1977) (paving of all interior streets in the subdivision); *Ayres,* 34 Cal.2d 31, 207 P.2d 1 (buffer strip); *Timber Trails Corp. v. Planning & Zoning Comm'n,* 222 Conn. 380, 389–93, 610 A.2d 620, 625–27 (1992) (installing state-approved water service and modifying lot size); *Aunt Hack Ridge Estates, Inc. v. Planning Comm'n,* 160 Conn. 109, 111, 273 A.2d 880, 882 (1970) (local ordinance authorizing park and open space requirements, which "shall in all cases be available and accessible to all residents of the subdivision."); *Garvin v. Baker,* 59 So.2d 360 (Fla.1952) (condition requiring on-site street and sidewalk standards); *City Nat'l Bank v. City of Coral Springs,* 475 So.2d 984 (Fla.Dist.Ct.App.1985) (ten-foot buffer strips, street signs and widening of street); *Oakes Constr. Co. v. City of Iowa City,* 304 N.W.2d 797 (Iowa 1981); [7]

---

7. In *Oakes Constr.,* 304 N.W.2d at 806, the Iowa Supreme Court described the two approaches to the imposition of subdivision conditions, the strict approach "whereby a council must be able to point to an explicit provision on which it bases disapproval of a plat," and the liberal approach, which "takes account of the likelihood that not every conceivable flaw . . . can be anticipated by specific language in ordi-

*United Reis Homes, Inc. v. Planning Bd.,* 359 Mass. 621, 270 N.E.2d 402 (1971) (construction of drainage facilities); *Sansoucy v. Planning Bd.,* 355 Mass. 647, 246 N.E.2d 811 (1969) (installation of underground utility lines); *Ellen M. Gifford Sheltering Home Corp. v. Board of Appeals,* 349 Mass. 292, 208 N.E.2d 207 (1965) (upholding condition of not more than one dwelling on each lot); *River Birch Assocs. v. City of Raleigh,* 326 N.C. 100, 388 S.E.2d 538 (1990) (conveyance of open space to the owner's subdivision); *Clark v. City of Albany,* 137 Or.App. 293, 904 P.2d 185 (1995) (on-site traffic-free area and storm drain facilities), *review denied,* 322 Or. 644, 912 P.2d 375 (1996); *Crownhill Homes, Inc. v. City of San Antonio,* 433 S.W.2d 448 (Tex.Civ.App.1968, writ ref'd n.r.e.) (on-site water mains); *In re Denio,* 158 Vt. 230, 240–41, 608 A.2d 1166, 1172–73 (1992) (aesthetic open space requirements); *Prudential Trust Co.,* 492 P.2d 971 (reconfiguring streets to line up with off-site public streets).

In *City of Carbondale v. Brewster,* 78 Ill.2d 111, 34 Ill.Dec. 838, 398 N.E.2d 829 (1979), *appeal dismissed,* 446 U.S. 931, 100 S.Ct. 2145, 64 L.Ed.2d 783 (1980), the Illinois Supreme Court noted that "a residential land subdivider may properly be required, as a condition to approval of the plat, to provide curb and gutter and suitable storm-water drainage facilities." *Id.* at 115, 34 Ill.Dec. at 840, 398 N.E.2d at 831. That same court, in *Petterson v. City of Naperville,* 9 Ill.2d 233, 137 N.E.2d 371 (1956), also upheld a subdivision approval subject to the condition that the developer provide curbs, gutters and drainage facilities within the subdivision. In *Petterson,* the court stated "[t]he privilege of the individual to use his property as he pleases is subject always to a legitimate exercise of the police power under which new burdens may be imposed upon property and new restrictions placed upon its use when the public welfare demands." *Id.* at 247, 137 N.E.2d at 379.

---

nances and statutes." The court adopted the liberal approach. It then held that "the council could consider the subject of access" and upheld the subdivision disapproval. *Id.* at 807.

In *Patenaude v. Town of Meredith*, 118 N.H. 616, 392 A.2d 582 (1978), the Meredith Planning Board imposed several conditions before it would approve a subdivision plat. They included one provision that identified several proposed lots, considered unsuitable for building, to be left as open space. The New Hampshire Supreme Court stated:

> [W]hen an owner intends to develop his land in a manner that will result in a significant number of people forming a community on that land, adequate recreational space is a necessity.... [T]he Meredith Planning Board clearly intends that those moving into the subdivision will have an adequate recreational area. Thus the limitation in use is necessitated by the subdivision itself and need not be compensated.

*Id.* at 623, 392 A.2d at 586.

With the above in mind, it is important to understand that not all conditions attached to subdivision approvals or imposed on approved subdivisions are "subdivision dedications," and that no such conditions are "common-law dedications." Subdivision dedications and common-law dedications are different creatures as well.

> Dedications required under subdivision regulations should be distinguished from common law dedications. Common law dedication involves an offer to dedicate and a corresponding acceptance by a local government. Under common law dedication a developer is estopped from later questioning the acceptance. In subdivision regulation dedication, however, questions of legislative authority and constitutionality arise.

Julian Conrad Juergensmeyer & Thomas E. Roberts, *Land Use Planning and Control Law* 315 (1998).

Generally, common-law dedications are voluntary offers to dedicate land to public use, and the subsequent acceptance, in an appropriate fashion, by a public entity. Common-law dedications are not mandated by statute. The offers are generally, although not exclusively, made by showing roads, parks or similar facilities on plats without any limitations on

dedication, and the recording of those plats. Generally, acceptance is made by an express recorded document or by the appropriate entity assuming control and maintenance of the property offered. With acceptance, common-law dedication is complete.

Referring to common-law dedication in *Carr v. Hopkin*, 556 P.2d 221, 224 (Wyo.1976), the Wyoming Supreme Court stated, "[t]here must be intent of the owner to devote the property to a public use ... and there must be an acceptance. This last requirement is most important to protect municipalities from having someone impose upon them the responsibility for maintenance and repair of streets or highways." [8] (Citations omitted.)

In *Priolo v. City of Dallas*, 257 S.W.2d 947, 953 (Tex.Civ. App.—Dallas 1953, writ ref'd n.r.e.), the Texas Court of Appeals noted the difference between a statutory dedication and a common-law dedication:

Prior [to the statute at issue], ... an offer of dedication was accepted in one of the three well-recognized methods, (1) by the municipality through proper authorities; (2) estoppel created by sale of lots to persons relying on such plat dedicating streets; or (3) actual public user.... It is therefore with reference to a common law offer of dedication that the foregoing methods of acceptance are applicable in contrast to an offer under the statute. "A common-law dedication by a plat may be revoked in whole or in part by the filing of an instrument vacating the plat or a part of it...."

The court noted further:

" 'Dedication' is a setting apart of land for the public use, and may be either statutory or at common law, the distinc-

8. In many instances, it is ultimately to a developer's sales advantage to offer to dedicate to the local government water and sewer facilities, streets, recreational areas or other sites because, if the offer is accepted, the local government, not the future residents of the subdivision, generally will be responsible for maintenance of the facilities. In "closed subdivisions," which limit public access, homeowners associations generally are responsible for maintaining such facilities.

tion between a statutory and a common-law dedication being that the statutory dedication operates as a grant, while the common-law dedication operates by way of estoppel in pais...."

*Id.* at 953 n. 2.

■ "A subdivision exaction [including a "subdivision dedication"] is a type of subdivision *regulation* that requires developers to make public improvements or install public facilities (or to finance them) at their own expense." 13 Powell, *supra,* ¶ 873[2][d][ii], at 79D–33 (emphasis added). Subdivision exactions typically take two forms: (1) a statutory dedication or (2) a payment of a fee in lieu of such dedication. *Id.* ¶ 873[3][c][i], at 79D–45.

For example, the court in *Coulter v. City of Rawlins,* 662 P.2d 888 (Wyo.1983), reviewed a subdivision regulation that imposed a dedication or fee requirement:

"a. All residential subdivisions shall provide for public parks and recreational sites *by dedication of land....* [D]edication of such sites and land areas *to the City* or ... in lieu thereof ... payment to the City of a sum of money equal to the value of the land which would otherwise be dedicated to the City.... Dedication of such sites and land areas shall be made at the time of final platting in one or any combination of the following ways:

"1. By dedicating to the City ... on the final plat.

"2. By granting the land area in fee simple or general warranty deed to the City...."

*Id.* at 893 (emphasis added).

■ A "[r]eservation[, a type of condition,] ... is a setting aside of specified land for a specific public purpose. It effects no conveyance to the government, but it restricts the right of the subdivider to use the reserved land." 83 Am.Jur.2d *Zoning and Planning* § 563, at 451 (1983). We noted this distinction in *Howard County v. JJM, Inc.,* 301 Md. 256, 270, 482 A.2d 908, 915 (1984), when we quoted from D. Hagman,

*Urban Planning and Land Development Control Law* § 140, at 259 (1975):

"Dedication ordinarily involves the conveyance of an interest in land by the fee owner *to the public;* usually to the local government having jurisdiction over the land. Reservation, on the other hand, involves no conveyance but restricts the right of the subdivider and others to use the land for anything but the restricted purpose." [Emphasis added.]

*River Birch Associates v. City of Raleigh,* 326 N.C. 100, 108, 388 S.E.2d 538, 542 (1990), further explains this public versus private conveyance distinction:

A conveyance creates a "dedication" only when the conveyance benefits the public at large and not merely a portion of it, such as the property owners within a particular subdivision. "[T]here is no such thing as a dedication between owner and individuals. The public must be a party to every dedication. In fact the essence of a dedication to public uses is that it shall be for the use of the public at large." *Jackson v. Gastonia,* 246 N.C. 404, 409, 98 S.E.2d 444, 447 (1957) (quoting authorities). The ordinance in this case states unequivocally that the conveyance of common areas shall be in fee simple to the home owners' association, which is composed of the property owners of the subdivision. [Alteration in original.] [Citation omitted.]

 The recreational area condition on appellees' subdivision request does not constitute a dedication because the proposed recreational space is not for general public use; it is intended only for the use of those residing within the Parkway development. The recreational space requirement is a condition.

A subdivision dedication can be distinguished from a condition imposed on a subdivision approval (whether a reservation or otherwise) depending on the intended recipient. A subdivision dedication requires a developer to give the public the right to use a portion of his property or gives one of the incidents of ownership (e.g., an "in lieu" fee) to the public at

large to use. A subdivision condition, like the provision at issue in this case, merely limits the method in which a property owner may thereafter use the property. A subdivision dedication is an exaction generally governed by the standards discussed by the Supreme Court in *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994):(1) whether there is an essential nexus as described in *Dolan;* and, if so, (2) whether the property interest taken is roughly proportional with the demand on public services created by the development. A condition not equating to an exaction normally is governed by "regulatory takings" analysis: (1) whether, as with statutes in general, a public purpose exists, and, if so, (2) whether the regulation deprives the property owner of all viable economic use of the entire property at issue,[9] which in the case at bar is, at the least, the entire third phase of the development.[10] *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 2894–95, 120 L.Ed.2d 798 (1992).

The *Nollan/Dolan* [exaction] requirement takes the form of a two-part test: . . . a permit condition imposed by government: (1) must have an "essential nexus" to a legitimate state interest; and (2) be "roughly proportionate" to the projected impacts of the proposed development. . . .

Accordingly, the *Nollan/Dolan* unconstitutional conditions subset of regulatory takings law possesses its own legal

---

**9.** The primary focus in exactions cases will be whether the exaction is roughly proportionate; in "regulatory taking" cases the focus is on whether viable economic use remains.

**10.** Recent "takings" analysis in the cases has tended to compartmentalize takings into two main areas: (1) actual physical takings including exactions, and (2) *regulatory* takings, *i.e.,* the effect of a regulation leaving a property owner with no, or little, remaining viable economic use of the property. In the regulatory takings area, one important issue is the meaning of the term "viable" in the context of a specific case. There are in addition several subsets of takings jurisprudence that remain extant despite the apparent attempts to formalize the area of constitutional law into the two main areas. These subsets of constitutional analysis come primarily from earlier cases and generally have not been overruled or discarded by the more modern cases. We shall attempt to distinguish the older, but surviving concepts, *infra.*

standards, and is conceptually distinct from "partial," "total" or "temporary" regulatory takings principles.

Dwight H. Merriam, *What is the Relevant Parcel in Takings Litigation?, in 1999 Zoning and Planning Law Handbook* 353, 370 (Deborah A. Mans ed.1999). For instance, the Oregon Court of Appeals in *Clark,* 137 Or.App. at 301–02, 904 P.2d at 190, concluded

that the condition [to create an on-site traffic-free area] is not an exaction; it is essentially a traffic regulation. Regulations of that kind are not "exactions" and are not subject to the *Dolan* test, as distinct from the tests for pure "regulatory takings." Condition 10 is a simple limitation on use, and petitioner makes no *regulatory* taking argument. [Citation omitted.]

The two concepts are very different, although exactions and regulatory takings both may arise from statutes. *Cf. Lucas,* 505 U.S. at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d 798. The statute in *Lucas,* for instance, prohibited Mr. Lucas from building anything on his property. It did not require him, for instance, to give any of the incidents of his property ownership, or any part of the property, to the State, nor did it require him to permit the public at large to use his property or exercise any of the incidents of ownership over his property. The Supreme Court said:

We have, however, described at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint. The first encompasses regulations that compel the property owner to suffer a physical "invasion" of his property. In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation. For example, in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), we determined that New York's law requiring landlords to allow television cable companies to emplace cable facilities in their apartment

buildings constituted a taking, even though the facilities occupied at most only 1½ cubic feet of the landlords' property. See also *United States v. Causby*, 328 U.S. 256, 265, and n. 10, 66 S.Ct. 1062, 1067, and n. 10, 90 L.Ed. 1206 (1946) (physical invasions of air space); cf. *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (imposition of navigational servitude upon private marina).

The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land. As we have said on numerous occasions, the Fifth Amendment is violated when land-use regulation "does not substantially advance legitimate state interests [essential nexus] *or denies an owner economically viable use of his land.*"

*Id.* at 1015–16, 112 S.Ct. at 2893–94, 120 L.Ed.2d 798 (some citations omitted). The *Lucas* Court meant that in these two instances, even if there is a valid, connected public purpose, i.e., an essential nexus, there still must be compensation for the taking.

There are two prongs to both exaction and regulatory takings. The first prong for both is generally the same, the essential nexus between the legitimate public purpose and the requirement. In practice, the essential nexus may need to be more specific in *pure* exaction cases because of the more specific nature of the taking, i.e., it may need to relate more specifically to the need for the exaction. The second prong for exactions is the rough proportionality analysis; the second prong for regulatory takings is whether there remains viable economic use of the entire tract involved. If the taking is an exaction, it is an actual taking and whether remaining viable economic use exists is irrelevant.[11] If it is a "regulatory taking," whether the limitation is "roughly proportional" to the demands for public services is irrelevant. This distinction is important because exactions now are scrutinized typically under Fifth Amendment Taking Clause jurisprudence pursu-

---

11. Any exaction, no matter how small or large, must comply with the rough proportionality standard of *Dolan*.

ant to *Dolan*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), while "regulatory takings" usually are examined under *Lucas*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798, and related cases.

While the trend of the cases in the last twenty years has been towards a formulaic approach tending to include all "takings" analysis within either the *Lucas* "regulatory takings" analysis or the *Dolan* "exactions" analysis, there remain other relevant "takings" issues that do not fit into current "mainstream" concepts. We stated as much in *Maryland Port Administration v. QC Corp.*, 310 Md. 379, 388, 529 A.2d 829, 833 (1987): "To date courts have not developed a test which can be comprehensively and consistently applied to determine whether a government has taken property." While at the time of *QC Corp.* the impact of the "modern" takings cases, *Lucas*, *Dolan*, *Nollan*, and *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), was not yet apparent, there is no indication in those more recent cases that they are to supplant completely the areas of "takings" law that, even with the broad limits of the modern cases, do not fit within their framework.

Moreover, some of the early cases were based in substantial part on Maryland constitutional law. They include *Grant v. Mayor & City Council*, 212 Md. 301, 129 A.2d 363 (1957), where we noted that the property owner was challenging the ordinance at issue there under state constitutional grounds: "the enforcement of Ordinance 711 ... would take from them [rights of property] without compensation contrary to Art. 3, Sec. 40 of the Constitution of Maryland." *See also Stevens*, 240 Md. 563, 214 A.2d 778, ("appellants insist that § 42 is an attempt to 'take' their property ... which is proscribed by Article 23 of The Declaration of Rights, Article III, § 40 of the Maryland Constitution ....") *See also Leet v. Montgomery County* and *Richmond Corp. v. Board of County Comm'rs, infra*. We have not limited the consideration of Maryland constitutional issues to the "regulatory takings" (loss of viable economic use) analysis of the Supreme Court's *Mahon/Lucas*

line of cases or the federal standard for exactions under *Nollan/Dolan* (although our *Howard County v. JJM, Inc., infra,* case, in essence, was a precursor of the *Nollan/Dolan* rough proportionality standard).

An example of one type of case that generally would not fit within the *Lucas/Mahon* or *Nollan/Dolan* lines of cases would be when a governmental entity desires to prohibit altogether the operation of certain types of uses and enacts a statute that requires the cessation and subsequent demolition of an already existing use. In the absence of sufficient and proper amortization and nonconforming use provisions, constitutional "takings" issues could arise, even if remaining viable economic use would exist after the termination of the use and even if no exactions would result.

*Grant v. Mayor of Baltimore,* 212 Md. 301, 129 A.2d 363 (1957), and *Stevens,* 240 Md. 556, 214 A.2d 775, illustrate one of our pre *Nollan* and pre *Lucas* approaches to regulatory takings. These two cases show that, given the appropriate circumstances, we have held certain restrictions on existing nonconforming uses to be unconstitutional regardless of whether they effected deprivations of all economically beneficial use of property. In *Grant,* billboard companies and two owners of land leased for billboard use sought to invalidate a zoning ordinance establishing a five-year amortization period at the expiration of which all billboards in residential districts had to be taken down. This Court remarked that state courts across the nation have held that "it is unreasonable and unconstitutional for a zoning law to require immediate cessation of nonconforming uses otherwise lawful," *Grant,* 212 Md. at 308, 129 A.2d at 365, and cited, *inter alia,* the prior Maryland decision of *Amereihn v. Kotras,* 194 Md. 591, 601, 71 A.2d 865, 869 (1950) ("Manifestly this cannot be done, because it would amount to a confiscation of the property, and nonconforming use is a vested right and entitled to constitutional protection.").

This Court, however, then distinguished between regulations requiring immediate cessation of nonconforming uses

and those demanding cessation only after a reasonable amortization period. We reasoned that every regulation "impairs some vested rights because it affects property owned at its effective date"; therefore, the "distinction between an ordinance that restricts future uses and one that requires existing uses to stop after a reasonable time, is not a difference in kind but one of degree and, in each case, constitutionality depends on overall reasonableness, on the importance of the public gain in relation to the private loss." *Grant*, 212 Md. at 314, 315, 129 A.2d at 369. We further stated that the "significance and effect of difference in degree in any given case depends on circumstances, environment and length of the period allowed for amortization." *Id.* at 316, 129 A.2d at 370.

In *Grant*, the Court then conducted an in-depth consideration of the facts and competing interests involved in the particular case. The Court held that the amortization period was not unconstitutional for a number of specific reasons. First, it noted the extensive legislative findings that billboards depreciated property values and otherwise contributed to the detriment of residential neighborhoods. This demonstrated that there was a valid public purpose behind the ordinance. Next, the Court observed that the five-year amortization period was fair because the billboard companies themselves used a five-year depreciation rate for federal tax purposes. Even if the billboards proved to have a useful life beyond the five-year period, they could be transferred to commercial and industrial districts. Moreover, the billboards in residential districts constituted only 5% of the companies' total number of billboards in the City, and the companies' leases with landowners all contained clauses exempting the companies from liability for rent if the municipal ordinance required the billboards to be taken down. Thus, the Court concluded that, with regard to the billboard companies, the character of the governmental action was fair and reasonable and the economic impact on the companies was not severe. *Id.* at 316–21, 129 A.2d at 370–73.

In *Grant*, this Court also similarly considered the ramifications of the ordinance with respect to the two landowners who

leased their land to the billboard companies, finding that "any loss or harm that they suffer . . . is not sufficiently substantial compared to the public good to make the ordinance invalid as to them." *Grant*, 212 Md. at 321, 129 A.2d at 373. Although we stated that "[i]f the ordinance imposed such restrictions that the land could not be used for any reasonable purpose, it would, of course, be invalid," we did not limit our analysis to a finding that there had been no deprivation of all economically beneficial use. *Grant*, 212 Md. at 321, 129 A.2d at 373. Instead, the Court again considered such factors as the reasonable length of the amortization period and certain other factors, finding, *inter alia*, that their leases were only for one-year terms and that for the entire five-year amortization period they were able to earn revenue from the leases while seeking other uses for their property. *Id.* at 321–22, 129 A.2d at 373.

In *Stevens*, 240 Md. 556, 214 A.2d 775, we held that a purported amortization period did not prevent sections of an ordinance eliminating nonconforming uses from amounting to an unconstitutional taking. What distinguished the improper amortization in *Stevens* from the "true" amortization in *Grant* was that the nonconforming uses in *Stevens* did not pertain to commercial uses that lent themselves to amortization in order to protect the owner's investment. *Stevens*, 240 Md. at 570–71, 214 A.2d at 783. Rather, the ordinance compelled the removal or reduction of shrubbery, walls, other fixtures, and even soil above a certain height from portions of residential corner lots in order to serve the public purpose of improved traffic safety. As the Court noted, the City was attempting to force a few landowners to bear the burden of providing the public benefit of improved traffic safety "possibly to avert the necessity of erecting, at public expense, a stop sign or other traffic signal." *Stevens*, 240 Md. at 569, 214 A.2d at 782. In considering the fairness and reasonableness of the ordinance in detail, we again stressed that distinguishing a valid regulation of land use from an unconstitutional taking does not always lend itself to the application of sharply defined categories:

> [A] careful examination of the authorities discloses that when a "regulation" approaches the line of demarcation between it and a "taking" (and we think this is such a case), it sometimes does so by almost imperceptible gradations, so that it is difficult to determine where "regulation" ends and a "taking" is effectuated.

*Id.* at 564–65, 214 A.2d at 779. We held that the prospective sections of the ordinance were valid, as was the requirement that landowners trim their shrubbery and trees so long as the usefulness of the objects was not destroyed and no substantial losses were incurred. We held, however, that insofar as the ordinance required the reduction, removal, or destruction of existing property at the owners' expense, it was a taking, even though the owners would clearly not suffer from a deprivation of all economically beneficial or reasonable use of their property. *Id.* at 572–73, 214 A.2d at 784.

In several other cases, we have held that government action constituted a taking when the owners in question were not denied all beneficial uses of their property. For example, in *Leet v. Montgomery County,* 264 Md. 606, 287 A.2d 491 (1972), we held unconstitutional the application of trash-removal ordinances requiring a landowner to remove, at his own expense, automobiles abandoned on his property by trespassers against his will and without his knowledge. This Court held that, although there was no physical invasion or legal taking by the government, nonetheless the landowner was compelled to expend substantial private resources to serve the public good and therefore was deprived of his property without just compensation.

Several of our cases have also found unconstitutional takings when the government has attempted to use its regulatory powers to keep depressed, or even to depress, the value of property it anticipates it might need to acquire in the future. We have held that the government cannot use its regulatory powers to depress values in order to acquire the property at the lower values. Whether the regulations deprived the owner of all use for a temporary period, or reduced use over a longer period, we have held, generally, that when the purpose

is to depress values a "taking" can occur. *See Hoyert v. Board of County Comm'rs*, 262 Md. 667, 278 A.2d 588 (1971); *Carl M. Freeman Assocs., Inc. v. State Rds. Comm'n*, 252 Md. 319, 250 A.2d 250 (1969). We quoted *Freeman*, 252 Md. at 329–30, 250 A.2d at 255, in *Mayor of Baltimore v. Kelso Corp.*, 281 Md. 514, 519–20, 380 A.2d 216, 220 (1977):

> [I]n a case where the direct and sole purpose of the ordinance is to depress property values, ... we must weigh the public purpose sought to be advanced and the means taken to achieve it, in light of the constitutional right of the property owner to receive just compensation for his property taken by eminent domain. In such a situation the Walls of Jericho must fall and the property owner be permitted to defend himself against the ordinance. The ordinance is directly involved and is directly impinging upon one of his constitutional guarantees. The property owner must be protected from prejudicial evidence as to value based on restrictions on the use of his property unconstitutionally impressed as part of a design to freeze or depress its value. To hold otherwise is to deprive him of the opportunity to receive just compensation for his property guaranteed by section 40 of Article III of the Constitution of Maryland. [Alteration in original.]

Another area of "takings" law in which the cases have found unconstitutional takings not involving exactions, and in which remaining viable economic use arguably remains, are "vesting" cases. "Vesting" occurs when property owners have made significant steps in the development of a project prior to the enactment of statutes that prohibit what formerly was permitted. Even in Maryland, where the concept seems to be limited to situations in which some progress under the prior statutes is required, we have recognized the potential for unconstitutional takings to occur, even though a property owner might be permitted an economically viable use under the new statute. Although we held the ordinance valid in *Rockville Fuel & Feed Co. v. City of Gaithersburg*, 266 Md. 117, 291 A.2d 672 (1972), and held that Rockville Fuel's actions had not been substantial enough to vest in it the right to

proceed under the old ordinance, we acknowledged by implication that, had its actions been substantial enough, the new ordinance's impact on Rockville Fuel might have amounted to an unconstitutional taking, even though remaining viable economic use might have remained and any exaction from the property owner might not have occurred. In *Richmond Corp. v. Board of County Comm'rs*, 254 Md. 244, 255–56, 255 A.2d 398, 404 (1969), we said:

> In Maryland it is established that in order to obtain a "vested right" in the existing zoning use which will be constitutionally protected against a subsequent change in the zoning ordinance prohibiting or limiting that use, the owner must (1) obtain a permit or occupancy certificate where required by the applicable ordinance and (2) must proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being devoted to that use.

That type of constitutional protection would be available in the absence of exactions and even if remaining viable economic use might remain.

These cases and situations which we discuss next above— and there may be other situations as well (we have not discussed actual physical takings outside an "exaction" context, for instance nor have we here discussed the concept of zoning estoppel)—indicate that, while many "takings" situations may be categorized into "regulatory takings" as defined in the *Lucas/Mahon* line of cases, or into "exactions" as defined in the *Nollan/Dolan* line of cases, there are other categories that simply do not fit into these analyses of "takings" law. Accordingly, the Court will need, on occasion, to address the constitutionality of statutes outside the structure of the regulatory takings and viable economic use standards applied in most instances.

■ There are cases in which, even though viable economic use remains under the *Lucas* standard, further constitutional analysis is appropriate. In other words, if no viable economic use remains, and traditional nuisance issues are absent, an

unconstitutional taking generally will have occurred. If economic use remains, the additional analyses of the earlier cases, including our own, or even of current cases as they develop over time may, in a given instance, be necessary.

In *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), the United States Supreme Court, prior to *Lucas, First English Evangelical, Nollan, Dolan,* and *Del Monte Dunes, infra,* opined: "this Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." In *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), *aff'g* 95 F.3d 1422 (9th Cir.1996), the Court returned to the dilemma it recognized in *Penn Central* (if it had ever departed, given some of the language used in the previous cases). The *Del Monte Dunes* Court said:

> Almost from the inception of our regulatory takings doctrine, we have held that whether a regulation of property goes so far that "there must be an exercise of eminent domain and compensation to sustain the act ... depends upon the particular facts." Consistent with this understanding, we have described determinations of liability in regulatory takings cases as " 'essentially ad hoc, factual inquiries,' " requiring "complex factual assessments of the purposes and economic effects of government actions."

*Id.* at ——, 119 S.Ct. at 1644, 143 L.Ed.2d 882 (citations omitted).

In the case at bar, however, appellees have presented no evidence or compelling reason, nor did they proffer any constitutional questions other than the *Lucas* and *Dolan* issues. Indeed, under the circumstances of this case, it is difficult to contemplate other constitutional issues. The issue, *as presented* in the case *sub judice,* involves only a question of whether all viable economic use has been taken by the regula-

tion, whether there has been an exaction, and whether the trial court applied the correct concepts.

Continuing our consideration of the present case, the Supreme Court recently noted the inapplicability of the *Dolan* "rough proportionality" test to general "regulatory takings" issues in *Del Monte Dunes*. There, in a six-year effort, the developer originally had submitted subdivision plans for 344 residential units on a parcel where more than 1,000 units were permitted. When the planning commission disapproved that plan and informed the developer that a subdivision of 264 units would be approved, he submitted plans for a subdivision of 264 units. The planning commission disapproved that plan and asked the developer to resubmit a plan for 224 units, which the developer submitted. When the planning commission disapproved the 224–unit subdivision, the developer appealed to the city council, which referred the project back to the planning commission to consider a 190–unit subdivision. The developer resubmitted a plan for a 190–unit subdivision to the commission. The commission rejected that plan and the developer appealed to the city council. The council overruled the commission and granted the developer an eighteen-month conditional use permit. Several conditions were imposed on the permit including open space and environmental limitations, one of which was to preserve habitat for "Smith's Blue Butterflies," only one larva of which had ever been seen on the property. The developer then resubmitted his plans to the commission as required by the city council. The commission's staff found that the developer had complied with all of the city's conditions and recommended approval. The commission then rejected its staff's recommendation and again rejected the plan, leaving less than two months on the developer's conditional use permit. The developer again appealed to the city council and requested a twelve-month extension on the life of his conditional use permit. The city council finally denied the developer any extension and disapproved his plan. By this time, a sewer moratorium was in place. The Supreme Court noted "after five years, five formal decisions, and 19 different site plans, respondent Del Monte Dunes decided the

city would not permit development of the property under any circumstances. Del Monte Dunes commenced suit against the city...." *Id.* at ——, 119 S.Ct. at 1633, 143 L.Ed.2d 882 (citation omitted). The developer filed a 42 U.S.C. § 1983 action and ultimately was awarded $1,400,000.00 in damages. His property, in the meantime, had been bought by the State of California for use as a park.

The primary issues related to the developer's right to a jury trial. The Supreme Court, however, took notice that the United States Court of Appeals for the Ninth Circuit, in affirming the district court, had stated: "[e]ven if the City had a legitimate interest in denying Del Monte's development application, its action must be 'roughly proportional' to furthering that interest.... That is, the City's denial must be related 'both in nature and extent to the impact of the proposed development.'" *Id.* at ——, 119 S.Ct. at 1635, 143 L.Ed.2d 882 (quoting 95 F.3d at 1430) (alteration in original). The Supreme Court rejected the Ninth Circuit's attempt to apply the rough proportionality analysis to a "regulatory takings" case, stating:

Although in a general sense concerns for proportionality animate the Takings Clause, see *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) ("The Fifth Amendment's guarantee ... was designed to bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole"), we have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use. See *Dolan,* supra, at 385, 114 S.Ct. 2309; *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 841, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). The rule applied in *Dolan* considers whether dedications demanded as conditions of development are proportional to the development's anticipated impacts. It was not designed to address, and is not readily applicable to, the much different questions arising where, as here, the landowner's challenge is based not on excessive exactions but on denial of development. We believe, accordingly, that

the rough-proportionality test of *Dolan* is inapposite to a case such as this one.

*Id.* at ——, 119 S.Ct. at 1635, 143 L.Ed.2d 882.[12]

We further note that in *Messer v. Town of Chapel Hill,* 59 N.C.App. 692, 297 S.E.2d 632 (1982), *review denied,* 307 N.C. 697, 301 S.E.2d 390 (1983), a case cited by appellant and almost exactly on point, a state statute allowed local ordinances to require either a dedication or reservation of recreation areas. The developer in that case wished to place open space on the northeast corner of the parcel to be subdivided. The local Planning Board disagreed with the proposed shape and location of that parcel. The North Carolina Court of Appeals noted the importance of the disjunctive "dedication or reservation" requirement "because dedication of private property contemplates public use." *Id.* at 695, 297 S.E.2d at 634. The reservation, by contrast, did not amount to eminent domain because that power typically "is defined as 'the power of the sovereign or some agency authorized by it to take private property for public use.' " *Id.* at 696, 297 S.E.2d at 635 (quoting *Virginia Elec. & Power Co. v. King,* 259 N.C. 219, 220, 130 S.E.2d 318, 320 (1963)). The court concluded that "[m]erely changing the location of a recreation area as a condition of approval of a subdivision plan does not amount to a taking so as to require compensation." *Id.*

As in *Messer,* the case *sub judice* does not involve an exaction because no dedication has occurred. A rough proportionality review as to whether the need for recreational space is generated by the demands of the development is unnecessary because nothing has been exacted for the general public. Presuming that a valid public purpose exists, the test described in *Lucas,* whether the regulatory impact is so severe as to leave the property owner with no remaining viable economic use of the totality of his land, is the type of taking alleged in the case at bar.

---

**12.** The Supreme Court was unanimous in its rejection of using the "rough proportionality" test in regulatory limitation cases, although other parts of the majority opinion were challenged in concurring or dissenting opinions.

We note that in its opinion, the trial court utilized the term "dedication" indiscriminately. It used "dedication" to describe what actually were conditions, and then attempted to apply the *Dolan* "rough proportionality" standard. In doing so, the trial court erred.

In his opinion, the trial judge commented on Judge Williams' findings in the previous case, which we describe in part, *supra*. The trial judge below stated that Judge Williams had "ordered that the Commission was to approve the Section III Proposal and then send it to the Annapolis City Council to consider the limited issue of whether there was a need for recreational space, and if so, where it was to be located." Ultimately, the City Council approved Section III, attaching certain conditions that did not include any dedication to public use or any exactions relevant to this appeal. The pertinent conditions were

that the preliminary Plat entitled "Parkway, Section III", be approved subject to the following conditions . . . :

1. The developer shall provide a minimum of 2,375 square feet of recreational space *for common use* at Lot One located on the corner of Hilltop Lane and Tyler Avenue;

2. Lot One located on the corner of Hilltop Lane and Tyler Avenue shall not be improved with any residential dwelling unit. . . .

Resolution R–47–95 (emphasis added). These conditions are not exactions. The usual and customary meaning of the phrase "for common use" in a subdivision context is that all of the subdivision residents have the right to use the area.[13] Generally, it does not, without more, extend any rights to the public at large to use the area.[14] The condition does not limit

---

**13.** Under the circumstances of this case, the condition could also be construed to mean that the residents of all three phases have the right to use the area.

**14.** It may well be possible for a regulation to be so extensive that it might amount to an exaction or a "taking," even without any express provision for actual physical public use.

the right of appellees to exclude nonresidents of the subdivision from new Lot 1. It does not prohibit the posting of "no trespassing" signs for instance or other ways to deny access to the public. The second condition merely limits the uses appellees can make of new Lot 1. This, accordingly, is not an exactions case; thus, under the issues presented in this case, our review of the constitutionality of the conditions is governed by whether the conditions deny appellees all *viable* economic use of the property.

The trial judge further commented in reference to the first condition that "[t]he use of [appellees'] property as a mini-park would deprive [appellees] of their right to exclude others." He then cites two cases that describe the "right to exclude others" as an essential element of property ownership. As we have noted, the condition in the case at bar does not interfere with appellees' rights to exclude others. The condition does not require them to confer any rights of access to members of the general public, only to the owners of the subdivision and their successors in interest as appellees agreed to do in 1976.

The lower court then cited two "regulatory takings" cases, *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), and *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), for the proposition that if a regulation deprives a property owner of all economically viable use of his land, it is an unconstitutional taking of property. The trial court compounded its previous mistake by adding a third step:

> the final step of a takings analysis requires the Court "to determine whether the degree of the exactions demanded by the City's permit conditions bear the required relationship to the projected impact of the Plaintiffs' proposed development." *Dolan v. City of Tigard,* 512 U.S. 374 [114 S.Ct. 2309, 129 L.Ed.2d 304] (1994). In *Dolan,* the Supreme Court adopted the "rough proportionality test" for determining the question above.

. . . .

Having articulated the standard of law applicable in an analysis of a takings case, the Court can now apply the standard to the facts in the case at bar.

At this point the lower court had improperly mixed two different concepts: regulatory takings and exactions. As we stated, *supra,* a regulatory taking claim does not allege an actual physical taking. It is merely a claim that a regulation so limits the use of an owner's property that it leaves him with no viable economic use.[15] Initially, the concept of an exaction has been held to include, although they are not necessarily limited to, actual takings, albeit done by regulatory action. Exactions have been held to include such things as lateral beach easements, *see, e.g., Nollan,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677, flood plain and public bicycle easements, *see, e.g., Dolan,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304, a cable television easement, *see Loretto,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868, a $280,000 mitigation fee and $33,220 "in lieu of art" fee, *see Ehrlich v. City of Culver City,* 15 Cal.App.4th 1737, 19 Cal.Rptr.2d 468 (1993), *vacated,* 512 U.S. 1231, 114 S.Ct. 2731, 129 L.Ed.2d 854 (1994),[16] dedication of land for canals, *see, e.g., Wald Corp. v. Metropolitan Dade County,* 338 So.2d 863 (Fla.Dist.Ct.App.1976), *cert. denied,* 348 So.2d 955 (Fla.1977), impact fees, *see, e.g., Board of County Comm'rs v. Bainbridge, Inc.,* 929 P.2d 691 (Colo.1996); *Southern Nev. Homebuilders Ass'n, Inc. v. Las Vegas Valley Water Dist.,* 101 Nev. 99, 693 P.2d 1255 (1985), dedication of parks,

---

**15.** As we have explained, *supra,* in some situations regulatory "takings" claims may not be limited to cases in which no remaining economical use remains. In this case, however, the only allegations involved a loss of all economical use or an exaction.

**16.** The Supreme Court sent this case back to the state court for reconsideration in light of *Dolan.* On remand, the intermediate appellate court affirmed its prior holding that the exactions were permissible even under *Dolan* and *Nollan.* On appeal, the Supreme Court of California determined that the record did not contain sufficient evidence to satisfy the rough proportionality test, but remanded the case to the trial level to enable the city to again address rough proportionality. *See Ehrlich v. City of Culver City,* 12 Cal.4th 854, 50 Cal.Rptr.2d 242, 911 P.2d 429, *cert. denied,* 519 U.S. 929, 117 S.Ct. 299, 136 L.Ed.2d 218 (1996).

playgrounds and schools to the public at large, or fees in lieu thereof, *see, e.g., Associated Home Builders v. City of Walnut Creek*, 4 Cal.3d 633, 94 Cal.Rptr. 630, 484 P.2d 606, *appeal dismissed*, 404 U.S. 878, 92 S.Ct. 202, 30 L.Ed.2d 159 (1971); *Krughoff v. City of Naperville*, 68 Ill.2d 352, 12 Ill.Dec. 185, 369 N.E.2d 892 (1977); *Pioneer Trust & Sav. Bank v. Village of Mount Prospect*, 22 Ill.2d 375, 176 N.E.2d 799 (1961); *Collis v. City of Bloomington*, 310 Minn. 5, 246 N.W.2d 19 (1976); *Home Builders Ass'n v. City of Kansas City*, 555 S.W.2d 832 (Mo.1977); *Billings Properties, Inc. v. Yellowstone County*, 144 Mont. 25, 394 P.2d 182 (1964); *Bayswater Realty & Capital Corp. v. Planning Bd.*, 76 N.Y.2d 460, 560 N.Y.S.2d 623, 560 N.E.2d 1300 (1990); *Jenad, Inc. v. Village of Scarsdale*, 18 N.Y.2d 78, 271 N.Y.S.2d 955, 218 N.E.2d 673 (1966); *Frank Ansuini, Inc. v. City of Cranston*, 107 R.I. 63, 264 A.2d 910 (1970); *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802 (Tex.1984); *Call v. City of West Jordan*, 606 P.2d 217 (Utah 1979), *rev'd on other grounds in reh'g*, 614 P.2d 1257 (Utah 1980); *Jordan v. Village of Menomonee Falls*, 28 Wis.2d 608, 137 N.W.2d 442 (1965), *appeal dismissed*, 385 U.S. 4, 87 S.Ct. 36, 17 L.Ed.2d 3 (1966), mandatory dedications of streets, *see, e.g., City of Bellefontaine Neighbors v. J.J. Kelley Realty & Bldg. Co.*, 460 S.W.2d 298 (Mo.Ct.App.1970); *Vogel v. Board of County Comm'rs*, 157 Mont. 70, 483 P.2d 270 (1971); *Simpson v. City of North Platte*, 206 Neb. 240, 292 N.W.2d 297 (1980); *McKain v. Toledo City Plan Comm'n*, 26 Ohio App.2d 171, 270 N.E.2d 370 (1971), dedication of geothermal rights, *see Parks v. Watson*, 716 F.2d 646 (9th Cir.1983), dedication of drainage facilities, *see, e.g., Petterson*, 9 Ill.2d 233, 137 N.E.2d 371; *Divan Builders, Inc. v. Planning Bd.*, 66 N.J. 582, 334 A.2d 30 (1975), and the imposition of navigational servitudes, *see Kaiser Aetna*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332. Nothing similar to the exactions described in the cases above, and in many others, has happened here.

In the present case, the trial court stated that the city had overstepped its authority when it imposed the condition that proposed Lot 1 could not have a dwelling constructed on it. Apparently, the trial court made the mistake of considering

only the portion of the third-phase subdivision directly affected by the building and recreational space limitations, new Lot 1. After finding that both conditions met the essential nexus test, "the city has satisfied the requirements for the essential nexus test as specified by the U.S. Supreme Court in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677] (1987)," [17] the trial court went on to apply the *Dolan* rough proportionality test to the condition that no dwelling be built on Lot 1, saying there must be " ' . . . some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development.' " (Quoting *Dolan*, 512 U.S. at 391, 114 S.Ct. at 2319–20, 129 L.Ed.2d 304.) The trial court found "that [the] City Council's condition ordering that Lot One of the Section III Proposal be dedicated as recreational space to serve as a mini-park is not reasonably related to the needs that would be created by the subdivision should it be built." [18] The trial court applied the wrong standard because there was no dedication or other exaction. There was a condition that the open space area previously agreed to be placed at that location for the "common use" of the subdivision residents. The trial court should have applied the regulatory takings standard, i.e., under the issues, as presented in this case, whether there was loss of all viable economic use.

---

**17.** Again the trial court utilized an exactions case. The Nollans were required to give a lateral beach access easement to the general public. That is an exaction and an actual taking. The essential nexus or public purpose standards, however, apply generally to both exactions and regulatory takings cases.

**18.** "Reasonably related" is a term used by this Court in *Howard County v. JJM, Inc.*, 301 Md. 256, 482 A.2d 908. The Supreme Court in *Dolan*, 512 U.S. at 391, 114 S.Ct. at 2319, 129 L.Ed.2d 304, stated:

We think the "reasonable relationship" test adopted by a majority of the state courts is closer to the federal constitutional norm. . . . But we do not adopt it as such, partly because the term "reasonable relationship" seems confusingly similar to the term "rational basis". . . . We think a term such as "rough proportionality" best encapsulates what we hold to be the requirement of the Fifth Amendment [in respect to exactions].

The trial court also erred by not including *at least* the entire third-phase property (all of Lot 4, including the duplex lots).[19] In considering whether a regulatory taking has left remaining viable economic use of the property, the property to be assessed for economically viable use is, as we have said, the entire tract of land, not just the proposed new corner Lot 1. The Supreme Court began to establish limits when considering property in such a takings context in *Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631. In *Penn Central*, the Supreme Court was considering the effect of "landmark preservation" ordinances that had resulted in Penn Central being unable to erect a high rise in the airspace above its train station in New York City. Penn Central admitted that viable economical uses remained in the existing uses of the train station. It argued that the total denial of the ability to build above the train station was a complete limitation of its right to that segment of its property—the air rights. The Court noted that they argued

> that the Landmarks Law has deprived them of any gainful use of their "air rights"... and that, irrespective of the value of the remainder of their parcel, the city has "taken" their right to this superadjacent air space, thus entitling them to "just compensation" measured by the fair market value of these air rights.

*Id.* at 130, 98 S.Ct. at 2662, 57 L.Ed.2d 631. The Supreme Court declined to adopt Penn Central's theory that the air rights could be separated for "takings" considerations.

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In

---

**19.** As there clearly remains viable economic use in the remainder of Lot 4, the entire phase now being subdivided, we do not have to decide whether in assessing economic viability all three phases should be considered. We note that this property has been considered from the beginning as a three-phase project, and appellees have retained ownership of the future phases throughout the length of the project. They presumably have already received viable economic benefits from the sales of the first two phases. An assessment of economic viability may well require a consideration of the whole three-phase project.

deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole—here, the city tax block designated as the "landmark site."

*Id.* at 130–31, 98 S.Ct. at 2662, 57 L.Ed.2d 631. The Court noted that Penn Central's assertion that it could "establish a 'taking' simply by showing that [it] ha[s] been denied the ability to exploit a property interest that they . . . believed was available . . . is quite simply untenable." *Id.* at 130, 98 S.Ct. at 2662, 57 L.Ed.2d 631. In its discussion of the air rights issue, the Court discussed a claim that the city was taking Penn Central's air rights for use of the public. The Court said:

The Landmark Law's effect is simply to prohibit [Penn Central] or anyone else from occupying portions of the airspace above the Terminal, while permitting [Penn Central] to use the remainder of the parcel in a gainful fashion. This is no more an appropriation of property by government for its own uses than is a zoning law prohibiting, for "aesthetic" reasons, two or more adult theaters within a specified area, or a safety regulation prohibiting excavations below a certain level.

*Id.* at 135, 98 S.Ct. at 2665, 57 L.Ed.2d 631 (citations omitted).

The more recent case of *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), involved a Pennsylvania statute that required companies mining subsurface coal to leave a certain portion of the coal in place to support the surface above, avoiding subsidence problems.[20] The statute required the companies to leave in place 27 million tons of coal. The companies argued, in a takings context, that in determining whether there was any

---

**20.** In Pennsylvania, property law "subsurface" rights, under certain circumstances, were considered separate property. Many original owners, when subsurface and surface rights were combined as one property, had conveyed their subsurface mineral rights without reserving surface support rights. *See id.* at 478, 107 S.Ct. at 1238, 94 L.Ed.2d 472.

remaining viable economic use in the property only that 27 million tons of coal should be considered as the property. The State of Pennsylvania argued that all of the coal should be considered in assessing remaining viable economic use. The 27 million tons of coal required to remain in place constituted less than 2% of the total amount of coal. The Supreme Court said:

> The parties have stipulated that enforcement of the [statute] will require petitioners to leave approximately 27 million tons of coal in place. Because they own that coal but cannot mine it, they contend that Pennsylvania has appropriated it for the public purposes described in the Subsidence Act.
>
> This argument fails for the reason explained in *Penn Central* and *Andrus*. The 27 million tons of coal do not constitute a separate segment of property for takings law purposes. Many zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property. A requirement that a building occupy no more than a specified percentage of the lot on which it is located could be characterized as a taking of the vacant area as readily as the requirement that coal pillars be left in place. Similarly, under petitioners' theory one could always argue that a setback ordinance requiring that no structure be built within a certain distance from the property line constitutes a taking because the footage represents a distinct segment of property for takings law purposes. There is no basis for treating the less than 2% of petitioners' coal as a separate parcel of property.
>
> . . . .
>
> When the coal that must remain beneath the ground is viewed in the context of any reasonable unit of petitioners' coal mining operations and financial-backed expectations, it is plain that petitioners have not come close to satisfying their burden of proving that they have been denied the economically viable use of that property. The record indicates that only about 75% of petitioners' underground coal can be profitably mined in any event, and there is no

showing that petitioners' reasonable "investment-backed expectations" have been materially affected by the additional duty to retain the small percentage that must be used to support the structures protected by [the statute].

*Id.* at 498–99, 107 S.Ct. at 1248–49, 94 L.Ed.2d 472 (citation omitted).[21]

In *Concrete Pipe & Products v. Construction Laborers Pension Trust,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), the company argued that the provisions denying it the ability to withdraw from pension plans constituted an unconstitutional taking of its property. There the Supreme Court relied on both *Penn Central* and *Keystone Bituminous* in holding:

While Concrete Pipe tries to shoehorn its claim into this analysis by asserting that "[t]he property of [Concrete Pipe] which is taken, is taken in its entirety," we rejected this analysis years ago in *Penn Central* . . . where we held that a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of the parcel in question. Accord, *Keystone Bituminous* . . . . [Alterations in original.] [Citations omitted.]

*Id.* at 643–44, 113 S.Ct. at 2290, 124 L.Ed.2d 539; *accord Clajon Prod. Corp. v. Petera,* 70 F.3d 1566, 1577 (10th Cir.

---

**21.** The Supreme Court also distinguished regulatory takings from exactions:

We do not suggest that the State may physically appropriate relatively small amounts of private property for its own use [ (an exaction) ] without paying just compensation. The question here is whether there has been any taking at all when no coal has been physically appropriated, and the regulatory program places a burden on the use of only a small fraction of the property that is subjected to regulation.

*Id.* at 499 n. 27, 107 S.Ct. at 1249 n. 27, 94 L.Ed.2d 472.

1995) ("Regulatory taking jurisprudence 'does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.'" (quoting *Penn Central,* 438 U.S. at 130, 98 S.Ct. at 2662, 57 L.Ed.2d 631)); *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir.1993) ("Clearly, the quantum of land to be considered is not each *individual* lot containing wetlands.... If that were true, the Corps' protection of wetlands via a permit system would, *ipso facto,* constitute a taking in every case where it exercises its statutory authority."); *cf. Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) ("[T]he denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety.") [22]

The town in *Quirk v. Town of New Boston,* 140 N.H. 124, 663 A.2d 1328 (1995), amended its zoning ordinance while Quirk was in the process of seeking subdivision approval for additions to an existing camping ground. One amendment required a 200-foot "buffer" for campgrounds, prescribing that the outer 100 feet of the buffer stay in its natural condition. Quirk challenged the provision on several bases including "takings" claims.

The New Hampshire Constitution contained a provision, not specifically found in the Maryland Constitution or the United States Constitution, which provided that "no part of a man's property shall be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people." *Id.* at 130, 663 A.2d at 1332. After noting that "[a] reasonable zoning ordinance, therefore, effects an uncon-

---

**22.** The Supreme Court in *Concrete Pipe* has mixed principles it created for some federal "takings" cases relating to real property with a personal property "takings" case. We believe, however, that there could well be different principles applicable in respect to personal property "takings" issues. The case *sub judice* relates to the regulation of real property and we need not address the "taking" of personal property.

stitutional taking only if its application 'to a particular parcel denies the owner an economically viable use of his or her land,'" the New Hampshire Supreme Court noted that the owner considered only the 200-foot wide "buffer" area to be the property affected for unconstitutional taking purposes. *Id.* at 130–31, 663 A.2d at 1332 (quotation omitted). The court disagreed:

> Focusing on a discrete portion of a larger tract may be appropriate where the land owner has fragmented the property for distinct development or uses. *See, e.g., Penna. Coal Co. v. Mahon,* 260 U.S. 393, 414–15, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) (surface rights distinguished from mining rights); *Loveladies Harbor, Inc.,* 28 F.3d at 1174 (land developed or sold before regulatory environment existed not considered part of property affected by permit denial)....

> In the present case, we find no compelling reason to view the perimeter as a discrete segment of the campground....

> ... Accordingly, we uphold the trial court's determination that no constitutional taking occurred.

*Id.* at 131, 663 A.2d at 1332–33. *See also State Dep't of Envtl. Reg. v. Schindler,* 604 So.2d 565 (Fla.Dist.Ct.App.), *review denied,* 613 So.2d 8 (Fla.1992); *K & K Constr., Inc., v. Department of Natural Resources,* 456 Mich. 570, 575 N.W.2d 531, *cert. denied,* 525 U.S. 819, 119 S.Ct. 60, 142 L.Ed.2d 47 (1998); *American Dredging Co. v. State Dep't of Envtl. Protection,* 169 N.J.Super. 18, 404 A.2d 42 (App.Div.1979); *Zealy v. City of Waukesha,* 201 Wis.2d 365, 548 N.W.2d 528 (Wis. 1996); Richard C. Ausness, *Regulatory Takings and Wetland Protection in the Post-Lucas Era,* 30 Land & Water L.Rev. 349, 409–11 (1995); Merriam, *supra,* at 374 ("With the exception of the Scalia dictum in Lucas, the Court has uniformly taken the view that the denominator in regulatory takings cases should be viewed expansively, both to afford government regulators deference and to avoid a mode of analysis in which virtually every government regulation could be viewed as a

taking.").[23] The creation of the "rough proportionality" standard for exactions in *Dolan* did not affect the "nonsegmentation" principles established by *Penn Central, Keystone Bituminous, Concrete Pipe* and their progeny, which limit the geographic extent of regulatory takings analysis. The trial court in the case *sub judice* should have applied the regulatory takings analysis to at least the entire final phase of appellees' subdivision, rather than only the part affected by the conditions incorporated in Resolution R–47–95.

### III. Conclusion

The trial judge utilized an "exactions" standard from *Dolan* in reversing the decision of the City Council. In doing so, he erred. As we have indicated, *supra,* the facts of the present case do not support that the City has exacted anything from appellees by subdivision dedication or otherwise. The conditions imposed on the subdivision as a part of the City's subdivision approval process were, for the most part, agreed upon in 1976, and were, as finally imposed in 1995 pursuant to the design review provisions then in effect, limitations on the use of a part of the entire final phase of the three-phase subdivision project. There is no evidence that appellees were deprived of all remaining economically viable uses for the third phase of the subdivision.[24] Based on the facts of this case, and the issues, as presented, we perceive no unconstitutional taking of appellees' property. Accordingly, we reverse.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; COSTS TO BE PAID BY APPELLEES.**

---

**23.** For a history of statutory dedication, exaction and impact fees, see David L. Callies & Malcolm Grant, *Paying for Growth and Planning Gain: An Anglo–American Comparison of Development Conditions, Impact Fees, and Development Agreements, in Exactions, Impact Fees and Dedications* 357 (Robert H. Freilich & David W. Bushek eds., 1995).

**24.** *See supra* note 19.